Redacted Copy of AETN's Contract with Plaintiff

## Part I



235 E. 45TH STREET NEW YORK, NY 10017
www.aetn.com

**REDACTED**

**CONFIDENTIAL**

As of July 31, 2012

Planète Bleue Télévision Inc.
528, Place des Tuileries
Repentigny, Quebec  J5Y 4C5
Canada

Attention:  Jean Leclerc, Vice President

RE: **KILLER KIDS (9 new episodes)**
    PAC ID #:  21936

Ladies and Gentlemen:

This will acknowledge and confirm the terms pursuant to which **PLANÈTE BLEUE TÉLÉVISION INC.** (the "Producer"), a Canadian corporation, and **A&E TELEVISION NETWORKS, LLC** ("AETN"), a Delaware limited liability company, have agreed with respect to the new episodes of the series referenced in the caption above (the "Series" and the "Episodes", with each separate program being an "Episode") to be produced by Producer for AETN under this production agreement for anticipated initial exhibition over AETN's television networks, which shall include any programming service owned, controlled, programmed or operated solely or jointly with one or more third parties by AETN, A&E Network®, HISTORY (f/k/a The History Channel®), H2™ (formerly known as History International®), BIO. The Biography Channel®, [The] History [Channel] en español™, Military History Channel®, Crime and Investigation Network™, Lifetime® [Television], Lifetime Movie Network® (a/k/a LMN), Lifetime Real Women®, or any successors to such entities, or other licensees of Networks' name(s), trademark(s) and/or format(s) in any language (the "Networks"). Nine (9) Episodes are being ordered hereunder, with each Episode being one (1) hour in duration. The Episodes are to be shot in *high-definition television format*.

| | | |
|---|---|---|
| 1. | TERM: | The Term of this Agreement shall commence on the date hereof and continue for so long as AETN shall have any rights in the Episodes. |
| 2. | OWNERSHIP & DISTRIBUTION: | Subject to Producer's Format Rights below, AETN shall be the sole owner in perpetuity throughout the universe, exclusively, of any and all rights (including without limitation copyright and trademark), in and to the Episodes, including but not limited to all newly created elements thereof (e.g., all originally shot footage, interviews, and commissioned music[1]), the format, the title thereof and any associated Internet domain names, the shooting script, preliminary versions and drafts of the script, publicity |

---

[1] A sample composer agreement is included in Schedule A, attached hereto and made a part hereof.



As of July 31, 2012
**PLANÈTE BLEUE TÈLÉVISION INC.**                                    CONFIDENTIAL
*Killer Kids* (new episodes)
Page 2 of 27

materials, and any outtakes[2]; and AETN may use or exploit the same and all ancillary and subsidiary rights therein in any manner and in any media (whether now known or created in the future) including, but not limited to: standard television and non-standard television (e.g., transmission via pay or non-pay cable, microwave, multipoint distribution service (MDS), satellite master antenna television system (SMATV), direct broadcast satellite (DBS), and transmission directly to so-called "backyard" TVRO receiving dishes, online or wireless computer networks and similar transmissions, pay television, video-on-demand, pay-per-view, and "superstations" such as WTBS, and any transmission technology developed in the future), network television, television syndication, mobile, radio, theatrical, non-theatrical, "Videogram" (defined hereafter), publishing and merchandising without making any payment to Producer or any third parties whatsoever, except as specifically set forth herein. The parties acknowledge that Producer previously produced eight (8) episodes (the "Pre-existing Episodes") of the Series; and AETN acknowledges that Producer and its licensed distributor may exploit the Pre-existing Episodes without any financial obligation to AETN.

The term "Videogram" as used herein shall mean video cassette, video disc, and all other video device forms and configurations, including any and all digital and/or linear play and non-linear play interactive devices or technologies whether now known or hereafter developed, including download-to-own rights (e.g., iTunesDTO, AmazonDTO, and MobileDTO).

AETN shall be entitled, at any time and at all times, to utilize the structure, themes and general idea of the Series (the "**Format**") in production of programs with another (and other production companies (and without Producer's involvement), subject to the terms of the sentence which follows. As compensation for the right to utilize the Format and the Series title (the sufficiency of such consideration being hereby acknowledged by Producer), AETN shall pay Producer directly an amount equal ███████ ███████ of the per-episode budget of each such episode produced. Producer and its executive producers shall be credited on each such program, with Producer acknowledged as creator of the Series concept. (The phraseology for the origination credit shall be within the sole discretion of AETN.) AETN will own all rights in and to any such programs produced in which Producer is not the production company, but Producer shall be entitled to provide such programs to Les Chaînes Télé Astral, a division of Astral Broadcasting Group Inc., or to any

---

[2] For purposes of this Agreement, 'outtakes' means all of Producer's originally shot photographs and footage (e.g., location, interviews, etc.), and source masters (including graphics, but specifically excluding Third-Party Materials [defined hereafter]) relating to, or associated with, the Episodes. Notwithstanding the foregoing, AETN shall be entitled only to outtakes constituting dramatic reenactments and interviews and AETN's receipt of such shall be conditioned upon AETN paying transfer, editing, tape and shipping costs, as necessary.

209964v4

As of July 31, 2012                                                      CONFIDENTIAL
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killer Kids* (new episodes)
Page 3 of 27

successor company ("CTA"), on a non-exclusive basis, for telecast in
French for French Canada only.

If prior to the date of this Agreement, Producer filed any trademark
applications or registered any internet domain names in connection with the
Series, Producer shall assign in writing any and all rights in and to those
applications and/or domain names to AETN and execute all documents
necessary to perfect such rights in AETN.  Producer shall not file any
trademark applications or register any internet domain names in connection
with the Series without the prior written consent of an AETN officer.
[Notwithstanding the foregoing, Producer represents that it has not filed or
authorized any trademark applications or registered any internet domain
names in connection with the Series and has no knowledge of any such being
filed by any third party. AETN acknowledges that Producer cannot be held
responsible for any such applications if filed by a third party without
Producer's knowledge or consent.]

The Episodes, including but not limited to all newly produced elements
thereof (e.g., all originally shot footage, interviews, and commissioned
music), and any related materials (the "Materials") shall be considered works
made-for-hire under the United States Copyright Act of 1976, as amended.
In the event the Materials (including but not limited to the shooting script,
preliminary versions of that script, and publicity materials) are not deemed
works made-for-hire, Producer hereby assigns to AETN all rights (including
but not limited to copyright) in them and further agrees that AETN shall have
all right, title, and interest therein, including the sole and exclusive right to
use, convey, and authorize others to use them for any and all purposes
whatsoever and in any and all media now known or developed in the future
throughout the world in perpetuity, without limitation or restriction.
Producer shall not claim to have either under this Agreement or otherwise,
any right, title or interest of any kind or nature in the Materials, and Producer
expressly waives any so-called "moral rights" which may now be in or may
hereafter come into existence.

Notwithstanding the foregoing, any and all material including, without
limitation, archival footage, television footage, movie footage, photographs,
illustrations and licensed music ("Third-Party Materials") included in the
Episodes which is owned or controlled prior to the date hereof by third
parties (i.e., individuals, corporations, libraries and other entities licensing
Third-Party Materials to Producer for inclusion in the Episodes) ) and not
created for these Episodes, shall remain under the sole ownership, copyright
and control of such respective third parties, subject to AETN's right to use
such Third-Party Materials in accordance with this Agreement.  Producer

shall use best efforts, within the budgetary limits anticipated herein, to clear all Third-Party Materials for AETN's exhibition and distribution rights throughout the world in any and all media for at least the first ten (10) years of the Term ("Minimum Rights"). Producer acknowledges that any exception to the Minimum Rights must be approved by AETN in writing (such approval not to be unreasonably withheld) prior to Producer's delivery of the Rights Bible (defined hereafter). Producer shall use its best commercially reasonable efforts to obtain continuing options ("Rights Options") of at least seven (7) years to increase the Minimum Rights by time, territory and/or media, for specific fees ("Rights Fees"), which shall be exercisable and payable directly by AETN outside of the Financial Commitment.

Producer acknowledges that AETN must pre-approve in writing all third-party licenses for music, including library music (but specifically excluding Extreme Production Music, with which AETN has a blanket-master & synchronization licensing agreement, and Scoreganics, AETN's production music library), prior to Producer's execution of any such license (Producer shall send such licenses to the Manager, Music Services, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

During the Term hereof, Producer's services shall be rendered to AETN on a non-exclusive basis provided that no services that Producer renders for third parties shall interfere materially with the production of the Episodes.

AETN acknowledges that Producer has previously produced the Series and has licensed earlier episodes of the Series to AETN through its sales agent GRB Entertainment. Producer confirms that it has received no claims regarding its prior use of the title *Killer Kids* and that no party has alleged that such use is improper or infringing. Producer will include a copy of any title and/or trademark searches (including legal opinions), if any, and any trademark registration records, if any, in the Rights Bible (as defined hereafter). Producer affirms that it has received no claims alleging that its use of the title is infringing or otherwise violates the rights of any party or parties.

3.    PREMIERE,
      AWARDS &
      EXCLUSIVITY:

Producer warrants and represents that AETN's initial exhibition of the Episodes produced hereunder shall constitute the premiere exhibition of those Episodes throughout the world. Producer shall not submit the Episodes to any competition, festival or exposition whether for any award or not, without the express PRIOR written consent of AETN (such consent not to be unreasonably withheld.) In any such submission, AETN shall have prior approval rights regarding its credit provision in such application. AETN shall have the right to submit the Episodes to any competition, festival or exposition, so long as Producer is also treated

CONFIDENTIAL

on any application as the primary producer and is given credit on any submission.

*The parties acknowledge that, subsequent to AETN's premiere of each Episode, such Episodes may be made available to Producer for the purpose of licensing such Episodes to CAT for exhibition in the French language only in Canada under terms to be determined between Producer and CAT hereafter, as set forth above.*

4.   OPTIONS:   AETN shall have an exclusive option (the "Initial Option"), exercisable in writing no later than the earlier of (i) one hundred twenty (120) days after the premiere telecast of the final Episode ordered hereunder, or (ii) one hundred eighty (180) days from the delivery and technical acceptance of the Delivery Materials for such Episode, to require Producer to produce a minimum of ten (10) and up to twenty-six (26) additional one (1) hour Episodes, substantially similar in look, feel and format to the Episodes previously produced, pursuant to all of the same terms and conditions as those set forth herein, and with the same per-Episode Financial Commitment as the Episode ordered herein. Notwithstanding the foregoing, if Producer determines at any time that it cannot reasonably produce additional Episodes, AETN shall be entitled to produce such Episodes with a third party of its choice and Producer shall not be in breach of this Agreement.

If AETN exercises the Initial Option, AETN shall have five (5) additional exclusive and dependent options (the "Second Option", "Third Option", "Fourth Option," "Fifth Option" and "Sixth Option", respectively), each to engage Producer (if exercised) to produce a minimum of ten (10) and up to twenty-six (26) Episodes for each Option pursuant to the same terms and conditions contained herein, with the per-Episode Financial Commitment for Option increasing by ▮▮▮▮▮▮▮▮▮▮ on a cumulative basis over the per-Episode Financial Commitment for the preceding Option. Each such Option shall be exercisable in writing no later than the earlier of (i) one hundred twenty (120) days after the premiere telecast of the final Episode ordered under the preceding Option, or (ii) one hundred eighty (180) days from the delivery and technical acceptance of the Delivery Materials for such Episode. Notwithstanding the foregoing, if Producer determines at any time that it cannot reasonably produce additional Episodes, AETN shall be entitled to produce such Episodes with a third party of its choice and Producer shall not be in breach of this Agreement.

With respect to all Options herein, AETN and Producer shall mutually agree with respect to the dates on which any additional Episodes shall be delivered, as well as payment schedule of the applicable Financial Commitment; provided, however, such payment schedule for additional

CONFIDENTIAL

Episodes shall be no less favorable to Producer than the payment schedule set forth herein.  Each Episode shall be substantially equivalent in artistic quality to those previously produced by Producer.

AETN shall be entitled to increase the number of Episodes under the initial Order herein and under each Option up to the maximum of twenty-six (26) Episodes in the initial order herein and/or in any Option order at any time during the production of the applicable order, so long as Producer is still in pre-production, active production or post-production at the time of the notification of amplification of the order.  If AETN increases the number of Episodes of any order, as provided above, a new delivery schedule will be provided by Producer for such additional Episodes.

5.  **CREATIVE RIGHTS, CREDITS, & PRODUCT PLACEMENT:**

(a)  AETN shall have rights of prior creative approval (to be exercised in a timely manner) with respect to all key elements of the Episodes, namely: the concept, format, subject matter, treatment, scripts, graphics, music, host, principal performers, narrator, all talent agreements, director, writer, budget and production schedule, credits, rough cut and final cut.  Notwithstanding the foregoing, all key elements, treatments, opening and musical theme, and the narrative, dramatic and visual approach of each Episode shall be in keeping with the Pre-existing Episodes.  If AETN develops a new opening and a new musical theme for the Series, AETN shall give Producer access to such elements at no charge for use in the Episodes.

In addition to AETN's standard credits (which shall include, but not be limited to, individual credits for AETN staff), Producer shall receive appropriate individual executive-producer credits and the following permanent company credit at the end of each Episode:

"Produced by PLANÈTE BLEUE TÈLÉVISION for A&E TELEVISION NETWORKS®

The copyright on the Episodes shall read as follows:

"© 2013 A&E Television Networks, LLC.  All Rights Reserved."

Producer acknowledges that, because of the brevity of current Episode credit beds and the need to take all reasonable measures in the interest of hour-to-hour viewer retention, AETN's Networks have eliminated logo credits at the end of Episodes.  If AETN's policy changes so that production companies are generally and routinely accorded logo credits at the end of Episodes, Producer shall be entitled to such credit, if it so requests.

(b)  Product placement arrangements for the Episodes, if any, shall be governed by the following (however, the parties acknowledge that the Series is not likely to yield opportunities for product placement):

(i)      (A) "Product" shall mean any commercial good or service which an advertiser has contracted with AETN's Ad Sales Department to promote and publicize through its appearance on-screen and/or through audible mention in an Episode (or Episodes).

(B) "Product Casting" shall mean the inclusion of the Product as a significant element in the story line of the applicable Episode.  Without limiting the foregoing, a Product will be deemed to be included as a significant element in the story line of an Episode and such inclusion of the Product shall automatically be deemed to constitute Product Casting, if the Product is actually used, demonstrated and mentioned in multiple shots in such Episode (as opposed, for example, to a Passive Product Placement defined below).  An example of Product Casting:  Artist auditions for a role in a new Coke® ad or wins a year's supply of Coke in an Episode.

(C) "Active Product Placement" shall mean the inclusion of the Product in multiple shots or in a single shot of the applicable Episode, with attribution of a benefit or feature of such Product (which may include an audible mention of the Product) but without the Product playing a significant role in the story line of the Episode.  An example of Active Product Placement:  Artist drinks a Coke and comments on the great flavor or new can design.

(D) "Passive Product Placement" shall mean the inclusion of a shot or shots of the Product with clearly identifiable logo/brand emblem (but without an audible mention or feature attribution) in the applicable Episode, excluding any inclusion of the Product that constitutes Product Casting or Active Product Placement. An example of Passive Product Placement:  A liter of Coke is visible on Artist's table/desk during an Episode scene.

(ii)  Producer agrees to work cooperatively with AETN so that AETN is able to meet such product-placement obligations.  ███████

███████████████████████████████████████████████████

(iii)  Producer may seek product-integration opportunities for the Episodes with non-national brands, subject to consultation with AETN's Ad Sales Department and Programming Department, but in no instance shall

Producer engage in conversations with national advertisers about product placements, product integration, trade outs, and any other product-related opportunities without the prior approval of AETN's Ad Sales and Programming departments. All decisions regarding such product-integration opportunities shall be in AETN's sole discretion, and Producer acknowledges that AETN's appropriate sales integration personnel, and programming executive, must pre-approve all potential trade-out and/or integration vendors, as well as pre-approve the 'look and feel' of each integration. If AETN agrees to a non-national integration, Producer shall split any product integration fee of ███████████████████ or more with AETN on a ███████████████████████████

6.     TALENT

This production agreement is conditioned upon Producer concluding each Talent Agreement (if any), each of which shall be directly assignable solely to AETN, in accordance with the guidelines and obligations set forth in Attachment T (attached hereto and made a part hereof).

7.     EDITING &: NARRATION:

Producer shall edit the Episodes to AETN's one (1) hour program format as set forth from time to time by AETN's programming executives (currently, ██████████████). AETN shall have the right to edit the Episodes, at AETN's sole expense, for all purposes including, but not limited to, rescheduling, formatting, to insert commercials and to comply with AETN's standards and practices. AETN shall also have the right to renarrate the Episodes, at AETN's expense, including, without limitation, dubbing and/or reformatting in all languages. AETN shall make commercially reasonable efforts to preserve the look and feel and the aesthetic integrity of the Episodes throughout any editing process.

8.     FINANCIAL COMMITMENT:

AETN shall pay Producer ████████████████ ████████████████████████████████

If any of the Episodes do not meet AETN's reasonable expectations (as such expectations are understood in the basic-cable television industry), AETN shall be entitled to query Producer in writing regarding its use of the Financial Commitment paid by AETN hereunder and otherwise investigate such use of funds. After articulating its dissatisfaction with the production standards and/or values of the Episodes or any Episode thereof, AETN may request upon reasonable, advanced written notice any and all reasonable information as to Producer's use of funds and Producer shall respond promptly with the requisite information and/or documentation to all such reasonable requests.

The parties acknowledge that the Episodes are not being produced pursuant to any film/television production incentives implemented by Federal,

As of July 31, 2012                                                                    CONFIDENTIAL
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killer Kids* (new episodes)
Page 9 of 27

provincial or local authorities Canada and that

9.       PAYMENT SCHEDULE:



If Producer fails to deliver a technically acceptable master of any Episode in conformity with the milestones specified above, or a full and complete Rights Bible (or fails to cure delivery of such unacceptable master or incomplete Rights Bible within ten [10] business days of receipt of written notice by AETN of such fault or faults), and AETN has not agreed or consented in writing with Producer with respect to alternative

As of July 31, 2012                                                CONFIDENTIAL
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killer Kids* (new episodes)
Page 10 of 27

delivery dates, AETN shall have the right to reduce, or terminate, payment of the amounts set forth in subparagraphs 9(e) & 9(f) respectively, each as applicable, with no further obligation to Producer for payment under this Agreement, including payment of revenue-sharing/royalties as set forth in paragraphs 11(a) and 11(b) (in addition to any remedies AETN may have at law or in equity) until Producer cures same. If the full and complete Rights Bible is not received by AETN within sixty (60) days after notice as provided above, Producer shall forfeit its rights to revenue-sharing/royalties as set forth in paragraphs 11 (a) and 11(b) (in addition to any remedies AETN may have at law or in equity). Such reduction or termination does not relieve Producer of any obligations set forth in this Agreement.

**For payments to be processed, Producer must follow the procedures set forth in Schedule A attached hereto and made a part hereof.**

10. PRODUCER'S SHARE     AETN shall pay Producer ██████████████████████
    REVENUE:             ███████████████████████████████████████ derived
    from its distribution and exploitation of the Episodes in any **media**[3] (excluding Videogram, merchandising and/or publishing [all of which are addressed in different sections of tklhis Agreement] *and* short-form programming related to the Episodes in any media and on any platform [i.e., because AETN's use of such short-form programming is intended for promotion of the Episodes and/or of the Networks]).

    "Adjusted Gross Receipts" shall be defined as all monies actually received by, or credited to AETN from the exploitation of the Episodes in any and all media, now known or hereafter devised, and by any and all means other than (i) transmission on the Networks or use in any short-form programming related to the Episodes in any media or platform, (ii) Videogram distribution, (iii) merchandising and (iv) publishing, <u>less</u> (x) taxes collected by AETN or deducted from payments due AETN, and (y) amounts paid by AETN for Insurance in the event Producer fails to maintain standard Insurance (as defined in Paragraph 20) during the Term. For the avoidance of doubt: In no event and at no time shall Gross Receipts include any revenues for or from AETN's exhibition of the Episodes via the Networks nor any advertising revenue derived from any exploitation of the short-form programming)

    The term "Networks" as used herein shall mean any programming service owned, controlled, programmed or operated solely or jointly with one or more third parties by AETN, A&E Network, HISTORY (a/k/a The History Channel), History International, BIO. The Biography Channel, [The] History [Channel] en español, Military History Channel, Crime and Investigation

---

[3]'Media' as used in this paragraph includes paid subscription and transaction VOD and digital rental (e.g., Netflix)
209964v4

As of July 31, 2012
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killer Kids* (new episodes)
Page 11 of 27

CONFIDENTIAL

Network, Lifetime [Television], Lifetime Movie Network (a/k/a LMN), Lifetime Real Women, or any successors to such entities, or other licensees of Networks' name(s), trademark(s) and/or format(s) in any language.

**11.(A) PRODUCER'S VIDEO-GRAM ROYALTY:**

On a no-quote, non-precedential basis, AETN shall pay Producer a total royalty equal to ███████████ of Videogram Adjusted Gross Receipts (as defined below) for the Episodes, less the following reserves:

    i.    ███████████ for uncollected accounts (<u>i.e.</u>, bad debt), to be liquidated or otherwise adjusted to reflect actual uncollected accounts within a reasonable time, not to exceed one (1) year after being initially established for each accounting period; and

    ii.    ███████████ for returns of Videograms, to be liquidated or otherwise adjusted to reflect actual returns within a reasonable time, not to exceed one (1) year after being initially established for each accounting period.

"Videogram Adjusted Gross Receipts" shall be defined as all monies actually received by, or credited to, AETN from the Videogram exploitation of the Episodes, less (a) amounts collected or deducted for taxes, for shipping and handling, and actual returns, (b) deductions for manufacturing and packaging, advertising and promotion, quantity or trade discounts, (c) third party sales commissions, and (d) amounts paid by AETN for Insurance if Producer fails to maintain standard Insurance (as defined in Paragraph 16) during the Term.

**11.(B) MERCHANDISING & PUBLISHING:**

In respect of AETN's exploitation of its right to create and distribute for sale merchandise based on or derived from the Episodes ("Merchandise"), to hire others to, or grant others the right to, create and/or distribute for sale such Merchandise, to create, publish, distribute and sell print or online materials in the nature of books, magazines, pamphlets, pictures and the like (hereinafter "Publishing Products") relating to, based on or derived from the Episodes, or to hire others to create, publish, distribute and sell Publishing Products, or to grant others the right to do so (collectively hereinafter, "Merchandising and/or Publishing Activities), AETN shall pay to Producer a royalty of ███████████ ███████████ of the Merchandising and/or Publishing Adjusted Gross Receipts (as defined below) received by AETN from Merchandising and Publishing Activities. In consideration of such Merchandising and Publishing Participation, ███████████

As of July 31, 2012
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killer Kids* (new episodes)
Page 12 of 27

CONFIDENTIAL



"Merchandising and/or Publishing Adjusted Gross Receipts" shall be defined as all monies actually received by AETN from Merchandising and/or Publishing Activities, less (i) taxes collected by AETN or deducted from payments due AETN, (ii) costs of shipping and handling, (iii) actual returns, (iv) costs for manufacturing, (v) third-party sales commissions, and the following reserves.

(x) ███████████████ for uncollected accounts (i.e., bad debt), to be liquidated or otherwise adjusted to reflect actual uncollected accounts within a reasonable time, not to exceed one (1) year after being initially established for each accounting period; and

(y) ███████████████ for returns of applicable merchandise, to be liquidated or otherwise adjusted to reflect actual returns within a reasonable time, not to exceed one (1) year after being initially established for each accounting period.

Insofar as AETN is merely the recipient of licensing fees from third parties licensed by AETN to conduct Merchandising and/or Publishing Activities and/or to produce, distribute, sell, publish, and/or otherwise exploit Merchandise and/or Publishing Products, AETN shall pay Producer a total of ███████████ of gross licensing revenues received by AETN from such merchandise and Publishing Products.

Notwithstanding the foregoing, Producer acknowledges that the share of revenue participations set forth in Paragraphs 11(A) or 11(B) hereof may be reducible to the extent a share of revenue participation must be paid to on-camera participants in any Episodes.

12.   ACCOUNTING:

In the event AETN exercises the Initial Option, AETN shall account to Producer with regard to Producer's share of revenue hereunder on a quarterly basis.  The quarterly periods shall end on March 31, June 30, September 30, and December 31 of each year; provided however that no accounting need be rendered for a period in which less than ██████████ in total revenue share or Videogram royalties are payable. Accountings shall be rendered on or before the date ninety (90) days following the conclusion of each accounting period and shall be

CONFIDENTIAL

accompanied by payment of the applicable revenue share due in accordance herewith (if any).  Producer acknowledges that no share of revenue shall be payable hereunder for Videograms, Merchandise and/or Publishing Products sold at or below cost.

13.    AUDIT RIGHTS:    Producer may, at its own expense, upon reasonable advance written notice to AETN, audit AETN's books and records of account, relating to Producer's share of revenue as set forth herein, during normal business hours at the place that such books and records may be ordinarily kept, provided, however, that only one (1) audit shall be performed on the books and records of account for any one (1) calendar year.  All books and records and all data and information contained therein, except as required by law, shall be held in strictest confidence and shall not be disclosed to any other party other than Producer's principals, counsel and accountants provided that such accountants and counsel acknowledge in writing that they are bound by this confidence, and upon completion of such audit shall return all documents or copies thereof to the audited party.  All books and records and all data and information contained therein shall be used solely for the purpose of reporting to Producer the amounts of any alleged errors in payment of Producer's appropriate share of revenue hereunder.  Producer shall have three (3) years from the date of AETN's submission of a statement to file a written objection to that statement.  If AETN notifies Producer in writing that it denies the validity of the objection, Producer shall have two (2) years from the date of such denial to file suit.  Any statement not audited and/or objected to within two (2) years of submission shall be deemed conclusive and not subject to further contest with respect to the matters therein.   AETN shall bear the cost of an audit in the event such audit shows a discrepancy in excess of ███████████ provided that such discrepancy exceeds the audit cost.

14.    FEES AND RESIDUALS:    Producer shall be solely responsible for and shall indemnify and hold AETN harmless in connection with any and all non-Artist related union fees, residuals or payments that may come due to any person or entity in connection with the Episodes including, without limitation, the production, telecast, Videogram distribution or other exploitation thereof as provided herein.  Furthermore, if AETN is required to make any payment directly to third party rights-holders to obtain needed rights to exploit the Episodes as permitted herein as a result of Producer's failure to obtain clearances as required hereunder, AETN may, after giving Producer notice and an opportunity to cure within fifteen (15) business days from such notice, recoup such payments prior to making any payments to Producer with respect to Videogram royalties or other revenue share. Notwithstanding the foregoing, AETN shall be responsible for remitting music performance rights fees payable to any of ASCAP, BMI or SESAC arising out of AETN's telecast of the Episodes as granted herein.

As of July 31, 2012                                                CONFIDENTIAL
**PLANÈTE BLEUE TÉLÉVISION INC.**
*Killer Kids* (new episodes)
Page 14 of 27

15. DELIVERY MATERIALS:  a.  Producer agrees to deliver the materials listed in subparagraphs 16 (b-e) below to AETN on or before <u>the following dates:  Episode #1, November 1, 2013; Episode #2, November 15, 2013; Episode #3, December 6, 2013; Episode #4, December 20, 2013; Episode #5, January 7, 2014; Episode #6, February 7, 2014; Episode #7, February 28, 2014; Episode #8, March 14, 2014; and Episode #9, March 28, 2014</u>.

b. Master and Clone Copies of each Episode, to be delivered to 250 Harbor Drive, Stamford, CT 06904, Attention: A&E Television Networks.  Contact AETN's Media Manager, as of the date hereof, ██████████████████████ prior to delivering any outtakes.  Producer shall be responsible for closed captioning the Episodes in a "three line roll up" or "timed and placed" manner (as AETN requests) in accordance with the standards of the industry unless AETN waives such obligation in writing.  Producer shall use one of the captioning facilities listed on Schedule A or La Sette of Montreal.  Furthermore, Producer shall ensure that AETN has access to the disk or data file containing the caption data, and that the closed captioning facility maintains such disk or data file in perpetuity.  Producer shall be responsible for costs incurred in reformatting such disk or data file and creating a new encoded master if:

    i.  Producer does not format the Episodes in accordance with AETN's specifications;

    ii.  Producer determines that the Episodes must be edited after its delivery to AETN;

    iii.  AETN finds factual errors during the production and approval process and such errors are not corrected by Producer and require that the Episodes to be edited after delivery.

c. Producer also agrees to deliver the following materials to AETN's Legal & Business Affairs department at the address on the first page hereof:

    i.  A script and music cue sheets for the Episodes (a sample music cue summary sheet is included in Schedule A); and

    ii.  Producer shall deliver to AETN a full and complete written summary of the use of all Third-Party Materials (including but not limited to the Minimum Rights, Rights Options and Rights Fees, if applicable), pertaining to the Episodes (and, if applicable, each Episode) together with copies of all

As of July 31, 2012                                                     **CONFIDENTIAL**
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killer Kids* (new episodes)
Page 15 of 27

agreements relating thereto, as well as agreements relating to any other elements contained in the Program (e.g., interview, voice-over, hosting or composer agreements background checks, and the title/trademark search[es]) ("Rights Bible");

(A Rights Bible summary sheet is included in Schedule A);

AETN has developed an Internet-based system ("DEBUT") intended to facilitate efficient delivery by producers to AETN of rights bibles and other documentation and information, including scripts, music cue sheets, E&O information, producers synopses and credit, chyron and "lower-third" information. DEBUT is further intended to increase efficiency and speed with which AETN may approve rights information and Rights Bibles and with which it may make final payments to producers.  Producer is expected to utilize DEBUT for delivery of the rights documentation relating to the Program; it can be found at https://debut.aetvn.com (and the helpline email address is ███████████ If necessary, please contact ███████████ at ███████████ to arrange for a demonstration and training session.  Producer acknowledges that incomplete or deficient Rights Bibles sent to AETN shall be returned to Producer, at Producer's expense, to be corrected so that the Minimum Rights required are properly documented.  Producer agrees to use DEBUT to advise AETN of the parameters of all Third Party Material and acknowledges that incomplete or deficient Rights Bibles sent to AETN shall be returned to Producer at Producer's expense if sent manually, to be corrected so that the Minimum Rights required are properly documented.  Producer shall notify Rights and Clearances, attention ███████████████████████ within thirty-six (36) hours of failure to procure the rights outlined herein.

d.  Producer agrees to provide to AETN's Creative Services Department ███████████ promotional materials including: photography in digital form in accordance with the requirements set forth in Schedule A; program logos; a synopsis and description of the Episodes; a complete list of cast and credits; and biographies of key Episode performers and the host, if any.  All promotional materials provided by Producer shall be available to AETN for unlimited promotional use, for the duration of the Term.

** Timely delivery of each Episode is of the essence of this Agreement.

e.  Producer will also deliver one (1) piece of short-form programming (approximately 2 minutes in length) per Episode, which should include material that is not used in the Episode itself from the "key" interview of

As of July 31, 2012                                            CONFIDENTIAL
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killer Kids* (new episodes)
Page 16 of 27

that Episode, to complement and promote the Episodes, with delivery schedule, and content, and number of elements to be as mutually agreed hereafter between Producer and the AETN programming executive supervising the Episodes.  Such short-form material may be in the nature of "cutting-room floor" footage and does not need to be specially edited.  It is expected that each such short-form element shall be cleared for use in any manner or media in perpetuity, and otherwise be in accordance with all of Producer's obligations set forth herein relating to the Episodes.

16.   INDEMNIFICATION:     a.   Producer warrants and represents that it has the right, capacity and power to enter into this Agreement, to grant all rights granted herein, and to perform all of Producer's obligations hereunder and that AETN's exercise of its rights hereunder, including, without limitation, the exhibition, promotion, publicity and advertising use of the Episodes or any part thereof as granted herein shall not violate the rights of any third party.  Producer further warrants and represents that it (1) will comply in all respects with applicable federal, state and local laws (including, but not limited to, laws prohibiting discrimination, harassment or retaliation, and/or laws requiring supervisory training and other measures to prevent or remedy harassment); (2) provides a workplace free of discrimination or harassment on any basis prohibited by law; (3) provides avenues for affected or concerned employees (including, as required by law, service providers who are independent contractors, and not employees) to report suspected discrimination or harassment and to remedy same; and (4) takes reasonable steps to prevent discrimination, harassment or retaliation in its workplace.  Furthermore, due to the global scope of AETN's businesses, Producer warrants and represents that it will comply with the U.S. Foreign Corrupt Practices Act[5] and (effective as of July 1, 2011) the UK Bribery Act[6], which prohibit improper payments, whether direct or indirect, to any government employees and/or officials, to state-owned agency employees and/or officials, and in the case of the UK Bribery Act, facilitation payments to government employees and/or officials and commercial bribery.

b.   AETN warrants and represents that it has the right, capacity and power to enter into this Agreement, to grant all rights granted herein, and to perform all of AETN's obligations hereunder and that Producer's exercise of its rights hereunder shall not violate the rights of any third party.

c.   Producer shall indemnify and hold harmless AETN from and against any third-party claims, suits, actions at law, damages, penalties,

---

[5] For further information, Producer may visit www.justice.gov.criminal/fraud/fcpa/
[6] For further information, Producer may visit www.justice.gov.uk/guidance/bribery.htm

209964v4

liabilities, costs and expenses, including but not limited to reasonable outside counsel fees ("Claims"), directly relating to the Episodes and/or the production thereof, or arising from exhibition or distribution of the Episodes, any material breach of any warranty or representation made by Producer herein, and any promotional use of the Episodes or any elements thereof in any manner in any media (but not as a direct endorsement of any product), including, without limitation, clips, photographs and music (except that AETN will not use specific elements that Producer notifies AETN, in writing, are not available for promotion of the Episodes, and/or the Networks).  For the avoidance of doubt, Producer and AETN agree that AETN's review and approval of, or exercise of any of AETN's creative rights as set forth herein, will not constitute a waiver or limitation in any way whatsoever of Producer's indemnification obligations set forth herein.

d.   AETN shall indemnify and hold harmless Producer from and against any third-party claims relating to:

    i.   material furnished by AETN with respect to promotion of the Episodes or any element thereof and/or the Networks,

    ii.   any material additions, deletions or alterations made to the Episodes or any element thereof by AETN;

    iii.   any additions made by AETN to any promotional materials furnished by Producer;

    iv.   any breach by AETN of its warranties made hereunder; and

    v.   aspects of AETN's exhibition and distribution of the Episodes or any element thereof which are within AETN's control.

e.   Producer's sole remedy for a breach or alleged breach by AETN of this Agreement shall be, if any, an action at law for damages (but specifically excluding special damages, lost profits, speculative damages or punitive damages), and in no event shall Producer (including, but not limited to, Producer's employees, agents, affiliates, subsidiaries or parent companies) be entitled to seek injunctive or equitable relief, or terminate or rescind any rights granted to AETN hereunder, or otherwise restrain or interfere with AETN's exhibition and/or other exploitation of the Episodes contemplated herein.

17.   INSURANCE:          Producer shall comply with AETN's insurance requirements, as set forth in Exhibits A, A-1, B-1 and B-2, attached hereto and made a part hereof. For the avoidance of doubt, all on-camera personnel shall be covered

As of July 31, 2012
**PLANÈTE BLEUE TÈLÈVISION INC.**
*Killer Kids* (new episodes)
Page 18 of 27

CONFIDENTIAL

under Producer's insurance policies (whether or not any such on-camera personnel are contracted to AETN, or Producer). Producer has read such Exhibits and the individual signing on behalf of Producer acknowledges that Producer is aware that the insurance specified in such Exhibits (except as otherwise explicitly excluded in such Exhibits, or in writing by an AETN officer) must be obtained through AON/Albert G. Ruben Company.

18.  FORCE MAJEURE/
     TERMINATION:

Producer shall not be liable for delays in delivery caused by AETN, or acts of force majeure (*i.e.*, if the production of the Episodes is prevented or canceled because of an act of God, inevitable accident, fire, earthquake, lock out, strike or other labor dispute, riot or civil commotion, act of public enemy, enactment, rule, order or act of government or governmental instrumentality (whether federal, state, local or foreign), failure of technical facilities, failure or delay of transportation facilities or other cause of a similar or different nature not reasonably within Producer's control). Producer shall not be obligated to deliver such Episodes, and AETN shall not be obligated to make any payments to Producer in connection therewith (except for accrued, unpaid compensation/payments due, if any) for so long as any such Force Majeure shall continue. In addition, if delivery of the Episodes is so prevented or delayed for thirty (30) days or more, AETN shall have the right to cancel its order of the Episodes if production has not been completed and to recover from Producer any sums (other than Producer's accrued production company fee) paid hereunder which Producer has not expended or irrevocably committed prior to such event of Force Majeure, and Producer shall be obligated to deliver to AETN within a reasonable amount of time all of the elements and materials of such Episodes in existence at the time of such cancelation .

In addition to any termination rights AETN may have at law or in equity, AETN shall have the right to terminate its engagement of Producer with cause (as such is defined hereafter), at any time during the Term upon reasonable prior written notice to Producer. "Cause" shall be defined as a material, uncured breach of this Agreement by Producer, which has been the subject of reasonable, prior written notice by AETN to Producer (actually received by Producer) and which remains uncured by Producer on the twentieth business day following such notice. If AETN terminates this Agreement with Cause, it shall be entitled, as it elects, to take production of the Episodes in-house or place it with another production company or individual producer. Upon termination, Producer shall refund to AETN any and all funds which AETN has advanced to Producer in connection with the Episodes which remain in Producer's custody, possession or control (including funds held by a financial institution, officer, director, employee, agent or fiduciary of any kind) that are not owed to, or recoupable

As of July 31, 2012                                                                CONFIDENTIAL
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killer Kids* (new episodes)
Page 19 of 27

from, any third party, and do not constitute a  pro-rated share of executive producer fees or production company fees  as permitted herein.

19.   CONFIDENTIALITY:   Except as may be required by applicable law, government order or regulation, or by order or decree of any court of competent jurisdiction or to confer with legal counsel or a financial institution which may be lending funds to Producer, Producer shall not divulge to any third party (i) any of the terms or conditions of this Agreement, including without limitation, the economic terms of the production (e.g., budget, license fees, revenue participations and any information relating thereto, etc.) and/or subject matter of the Episodes (provided that it shall not be a violation of this provision if Producer divulges the subject matter of the Episodes, and the fact that it is producing a program for Network, to a licensor of third party elements for inclusion in the Episodes), or (ii) any information as to the scheduling of the Episodes without the express written consent of an officer of AETN.

Notwithstanding the foregoing, nothing in this paragraph is meant to prevent Producer from mentioning AETN, the Episodes (i) for the purposes of soliciting new business; and (ii) in non-derogatory publicity which makes incidental mention of AETN, the Episodes (e.g., congratulatory trade ads in reputable publications (e.g., Broadcasting and Cable, Variety, etc.), provided however, that Producer shall not mention AETN, the Episodes prior to the publication of an AETN press release regarding the Episodes, as applicable, and its premiere date.  In addition, all advertisements that Producer proposes regarding the Episodes shall be approved by AETN prior to publication (such approval not to be unreasonably withheld).

20.   ASSIGNMENT:   AETN shall have the right to assign or sublicense its rights under this Agreement, in whole or in part, to any party whatsoever, including without limitation its subsidiaries or affiliates, or to any successor entity or other party acquiring all or substantially all of the business or assets of AETN, however AETN agrees to remain secondarily liable for all obligations and liabilities hereunder.

Producer shall not assign its rights or delegate its obligations hereunder, in whole or in part, without AETN's prior written consent.  Any assignment or delegation or attempted assignment in derogation of the foregoing shall be null and void *ab initio*.

21.   GENERAL:   This Agreement shall not be deemed to make either party a joint venturer or partner or agent of the other.  A waiver by either party of any breach or default by the other party will not constitute a continuing waiver of the same or any other breach or default under this Agreement.  This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and shall supersede all prior written or oral agreements between Producer and AETN with respect hereto.  This

As of July 31, 2012
**PLANÈTE BLEUE TÉLÉVISION INC.**
*Killer Kids* (new episodes)
Page 20 of 27

CONFIDENTIAL

Agreement shall not be modified, except by written instrument signed by authorized representatives of both parties. This Agreement shall be governed and construed exclusively in accordance with the laws of the State of New York applicable to contracts entered into and fully to be performed therein. If any provision of this Agreement shall be held by a court of competent jurisdiction to be contrary to law, that provision will be enforced to the maximum extent permitted by law and the remaining provisions shall remain in full force and effect. Each of the parties agrees that any proceeding arising out of or relating to the Agreement or the breach or threatened breach of the Agreement shall be commenced and prosecuted exclusively in Federal Court in the State of New York, Southern District.

In order to ensure compliance with Federal and state laws pertaining to pornography, AETN provides suppliers with Attachment 1 (attached hereto and incorporated herein). Producer hereby acknowledges that: (i) it has received Attachment 1 and (ii) it has taken, and will take, all steps necessary to comply with laws, regulations and procedures referenced therein which may be applicable to the Episodes.

PRODUCER'S EXECUTION OF THIS AGREEMENT IN THE SPACE PROVIDED BELOW SHALL FORMALIZE PRODUCER'S AGREEMENT TO THE TERMS CONTAINED HEREIN. WHEN THIS AGREEMENT IS COUNTERSIGNED BY AN AETN OFFICER, THIS DOCUMENT SHALL CONSTITUTE A VALID AND BINDING AGREEMENT BETWEEN THE PARTIES REGARDING THE EPISODES.

Please sign below and return all copies of the agreement to AETN to the attention of ████████

Very truly yours,

**A&E TELEVISION NETWORKS, LLC**

By: _M Reilly-Brooks_   _CW_
Maggie Reilly-Brooks
Senior Vice President &
Deputy General Counsel

_11/12/12_
Date

ACCEPTED AND AGREED:
**PLANÈTE BLEUE TÉLÉVISION INC**

By: _____

_JEAN LECLERC   VP Planete Bleue_
Print Name and Title

_____
Federal I.D. Number

209964v4

As of June 29, 2012                                                                                    CONFIDENTIAL
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killer Kids* (new episodes)
Page 21 of 27

## ATTACHMENT T

### MINIMUM DEAL REQUIREMENTS FOR EACH ARTIST

If Producer is hiring on-air talent for the Series or any Episode thereof, Producer shall ensure that each Artist's Talent Agreement complies with AETN's requirements set forth below (AETN must pre-approve any deviation from such obligations in writing):

1. **Services:** For no additional compensation, each Talent Agreement shall require Artist to provide the following services (in addition to services required for production e.g. on-camera shoot days, on-camera introductions, narration; voiceover services pick ups etc.) as requested by AETN and/or Producer (as applicable): (A) lead-ins, lead-outs, on-camera introductions, electronic press kits, "behind-the-scenes" and/or "making-off" footage; (B) promotional services including, without limitation: (i) a reasonable number of appearances at press and media events (e.g., TCA, NATPE, NCTA) for promotion of the Episodes; (ii) a reasonable number of print, radio, and television interviews with both national and local media; (iii) participation in still photography sessions (including but not limited to gallery and promotional shoots) both on and off the set/location; (iv) satellite media tours; (v) promotional screenings; and (vi) a reasonable number of other public or non-performing personal appearances before non-paying audiences as may be requested (Artist hereby acknowledges that a minimum of twelve [12][7] days [excluding travel days] per Series cycle for appearances at press and media events, public or non-performing personal appearances and print, radio and television interviews shall be deemed "reasonable", however no promotional work done from Artist's home shall count towards the twelve (12) day minimum); (C) "enhanced" production material related to the Pilot/Series intended for exhibition in short segments; (D) on-camera and off-camera promo spots, both on or off location, including, without limitation, sponsor branded promo spots, interstitials, brand bridges and/or vignettes; and (E) on-line promotional activities including, without limitation, blogs, v-logs, video diaries, webisodes, mobisodes and social media accounts related to the Pilot/Series (as requested by AETN).

2. **Product Integration:** Artist to acknowledge that, as AETN determines in its sole discretion, the Pilot/Series may contain product placements, product integrations and/or other similar sponsor-related references, information or activities (collectively, "Product Integrations"). Artist's services to include active participation in and with such Product Integrations as required by AETN for no additional compensation.

3. **Work-For-Hire:** All results and proceeds of the services to be rendered by Artist including, without limitation, all words, ideas, creations, , utterances/sounds, characteristics, movements, slogans, literary materials, artistic materials, catchphrases, other verbal expressions, any other terms used in or in connection with the Episodes or any participant therein, intellectual properties and/or performances other than the material licensed to AETN pursuant to Paragraph 7 below shall be considered "works-made-for-hire". Waiver of "moral rights".

---

[7] Increase to fifteen (15) days excluding travel days  if the maximum number of episodes per cycle exceeds 26

209964v4

4. **Options:** A minimum of five (5) options for Artist's services. Include right to back order.

5. **Fee:** Must be a complete 'buy-out' and include negotiated fees for subsequent cycles (whether as "bumps" or otherwise) must be included.

6. **Name and Likeness/Merchandise:** The right to use Artist's name/likeness/biography/ photograph(s)/voice (including, but not limited to, any catch phrases, slogans, verbal expressions or terms associated with Artist) as AETN elects: (i) for the purpose of advertising, promotion and publicity of the Pilot/Series and/or AETN (or any programming service thereof); and (ii) in and in connection with merchandise, publishing and all other ancillary rights including, without limitation, commercial tie-ins, in all media now known or hereafter devised throughout the universe in perpetuity. All merchandise in connection with the Pilot/Series to be controlled exclusively by AETN.

7. **Pre-existing Business Marks:** Artist grants AETN the irrevocable non-exclusive right to use in the Pilot/Series, and in any advertising and/or promotion of the Pilot/Series, AETN and/or the Networks, the name and trademark(s) of any principal business of any Artist featured in the Pilot/Series as further set forth in Exhibit X attached hereto and incorporated herein ("Artist's Marks") in any manner or media (now known or hereafter developed) and throughout the universe in perpetuity. During the Non-Competition Period, Artist shall not license Artist's Marks for use in any other audiovisual media (except to advertise Artist's business in a manner appropriate to Artist's industry) without AETN's prior written approval, which AETN may withhold in its sole discretion. Artist shall disclose in writing all third party licensing arrangements regarding Artist's Marks entered into prior to the Talent Agreement as a signed exhibit to such Talent Agreement. Furthermore, Artist shall not enter into any new third party license agreement regarding Artist's Marks without AETN's express written approval, and AETN shall have the right to negotiate an exclusive agreement with Artist regarding Artist's Marks, and the use thereof with respect to Merchandise and/or Publishing Activities. Artist acknowledges and agrees that Artist shall not have any right, title or interest in, to or with respect to any trademark, service mark, catchphrase and/or verbal expression (or the like) used in or in connection with the Pilot/Series and, without limiting the foregoing, Artist shall not register or file or attempt to register or file any rights therein or thereto

8. **Exclusivity:** So long as Producer shall have any Option in the Talent Agreement, from the date of the Talent Agreement through and including the date which is twelve (12) months after AETN has telecast the premiere of the final Episode which AETN shall be entitled to order hereunder (the "Non-Competition Period"), Artist's name, voice and likeness shall be exclusive to AETN, and Artist shall not appear in, be the executive producer of, or provide any services whatsoever for any other programming service (including, but not limited to, any broadcast channel or network, cable and/or digital network or programming service, as well as any digital or Internet brand extensions of any television outlets). If during the Non-Competition Period, Artist wishes to provide any services for a television outlet that is unrelated to a documentary, reality, and/or non-fiction genre program or series, (s)he shall so advise AETN in writing with specificity prior to entering into any agreements to provide such services, requesting AETN's approval therefore, and AETN shall not

As of June 29, 2012
PLANÈTE BLEUE TÈLÈVISION INC.                                      CONFIDENTIAL
*Killers Kids* (new episodes)
Page 23 of 27

withhold approval unreasonably.

In addition, during the Non-Competition Period, Artist shall not appear (unless otherwise requested by AETN) in any commercials or endorsements for any product or service competitive to (a) a sponsor of the Pilot/Series and/or a sponsor of AETN's programming services; (b) any sponsor whose products or services are integrated into the Pilot/Series, and/or (c) any sponsor with whom AETN has arranged for commercial tie-ins for the Pilot/Series, without AETN's prior approval, such approval not to be unreasonably withheld.

Artist shall not be on a television program that is scheduled to be exhibited at the same time as any regularly scheduled exhibition of the Pilot/Series.

9.  **Morals Clause:** Artist warrants and represents that, prior to the date of the Talent Agreement, Artist has not engaged in conduct violating Federal, state or local law(s) and has not committed any act or acts of moral turpitude which might violate community standards of AETN's viewers and advertisers in the United States and, if publicly revealed, would result in widespread public disrepute for Artist, AETN and/or its programming services' sponsors or subject them to scandal or ridicule. Artist acknowledges that, in entering into this Talent Agreement, AETN and Producer are acting in reliance upon Artist's warranty herein. Furthermore, Artist warrants and represents that [s]he shall never (a) provide services in an 'adult-themed' film or video program or perform onscreen services for any film or video program that is pornographic, involves nudity or graphic violence or contains material derogatory of any race, nationality, ethnic identity, gender or sexual orientation; (b) perform in any sexually explicit plays, musicals or stage shows (including strip tease acts); (c) pose as a model for any pornographic or sexually suggestive publication; or (d) circulate, cause to be circulated or negligently allow to be circulated any sex tape(s) in which Artist is depicted; furthermore, Artist represents and warrants that Artist has never participated or been a part of any activity that would fall within the scope of (a), (b), (c) or (d). Artist further acknowledges that (a) if Artist commits any act or acts of moral turpitude or engages in conduct violating Federal, state or local law(s), or (b) if AETN becomes aware that Artist has previously committed any such acts or has engaged in behavior that AETN reasonably determines brings or may bring Artist and/or any other talent, AETN (or any unit or employee thereof) or its programming services' sponsors into widespread public disrepute, scandal and/or ridicule or which reflects or may reflect unfavorably upon Artist and/or any other talent, AETN or a sponsor, then Producer shall be entitled to terminate this Talent Agreement forthwith by giving Artist notice of termination in writing at any time after AETN acquires knowledge of such act or conduct.

10. **Confidentiality & No Derogatory Statements:** Terms of the Talent Agreement are confidential and neither Artist nor his/her representatives shall issue any publicity releases or make any statements or announcements to the press regarding Artist's engagement without the express prior permission of AETN. Furthermore: (i) no Artist may use or otherwise reference involvement with AETN or the Pilot/Series in any manner or media whatsoever without the prior written approval of an officer of AETN (which AETN may withhold in its discretion); and (ii) no Artist nor anyone acting on behalf of Artist shall at any time use any of Producer's or

As of June 29, 2012                                            **CONFIDENTIAL**
**PLANÈTE BLEUE TÉLÉVISION INC.**
*Killers Kids* (new episodes)
Page 24 of 27

AETN's or its programming services' names, logos, trade names or trademarks (including, but not limited to, the title of the Pilot/Series or any logos or marks related to the Pilot/Series), or those of any of Producer's or AETN's related entities, or any word(s), catchphrases, slogans, verbal expressions or terms that have become associated with the Pilot/Series or any participant therein, for any purpose or in any manner whatsoever, without the prior written approval of an officer of AETN (which AETN may withhold in its discretion). Artist acknowledges and understands that (s)he shall not make any derogatory comments or statements of any kind in any media regarding any of the following: Producer (including but not limited to his employees and/or agents), AETN (including but not limited to its employees, agents, its programming services and/or any of its programming), and/or the Pilot/Series (including but not limited to any of Artist's fellow participants and/or the production thereof.) Artist acknowledges and agrees that Artist shall never make use of any "Social Media" (e.g., Facebook, Twitter, Flickr, Tumblr, Instagram, YouTube, LinkedIn or similar Internet source), in connection with the Series whatsoever (including, but not limited to, mentioning Producer, AETN, any of its programming services, and/or any of their executives and/or agents) without AETN's prior written approval. Artist agrees to comply with the terms of use of any Social Media websites that Artist is expressly permitted to use hereunder.

11. **Remedies:**  Waiver of injunctive relief

12. **Jurisdiction; Governing Law:**  New York

13. **Non-Union:**  All services to be provided on a non-union basis

14. **Background Checks/Psychiatric Evaluations:**[8]  Artist acknowledges that, as a condition hereof, AETN and/or Producer is entitled to undertake a background check and/or psychiatric evaluation to verify that Artist can participate in the Pilot/Series and has not been involved in or associated with any activities that could damage AETN's reputation or imperil the success of the Series, and that, if Producer and/or AETN elects to undertake such background check/psychiatric evaluation, AETN's and Producer's obligations shall be subject to AETN receiving results that are satisfactory to AETN, in AETN's sole discretion. Artist shall complete all requisite paperwork and provide Producer and/or AETN (as applicable) with all required information in order for Producer and/or AETN to conduct such background check/psychiatric evaluation.

15. **Representations and Warranties:**  Need representations and warranties from Artist, including without limitation that (i) all of Artist's work is original to Artist, and all of Artist's statements within the Pilot/Series are true, (ii) Artist has the right, power and authority to enter into the Talent Agreement, and there are no impediments to Artist performing all of his/her obligations set forth in the Agreement, (iii) Artist's services shall not violate the rights of any third party, and (iv) Artist will comply with all applicable federal, state and local laws (including, but not

---

[8] A list of vendors familiar with AETN background check requirements is attached as Attachment T-1

As of June 29, 2012
**PLANÈTE BLEUE TÈLÉVISION INC.**                                    CONFIDENTIAL
*Killers Kids* (new episodes)
Page 25 of 27

limited to, obligations regarding U.S. citizenship or permanent legal residence, licensing/permit requirements, etc.)

16. **Indemnity/Release of Claims:** Need indemnifications and release of claims from Artist

17. **No obligation to Use:** No obligation to use Artist's services/results and proceeds

18. **If Artist is using a Loan-Out:** Need inducement letter from Artist

19. **Assignment:** Artist's Talent Agreement is directly assignable to AETN

20. **HIPAA:** Use and/or disclosure of Artist's health/medical information requires a HIPAA compliant release.

21. **Termination:** Artist's services can be terminated with or without cause at any time.

22. **Plugola/Payola:** Artist represents that Artist has not (and will not) accept, and has not (and will not) pay, any money or provide services (or other valuable consideration) for the inclusion of any "plug," reference or product identification or of any other matter in the Pilot/Series.

ATTACHMENT T-1

# BACKGROUND CHECK VENDORS

\*\*AETN requires background checks for all recurring on-camera participants (or as otherwise requested by AETN).  At a minimum, check should be level 1, including driving history and media. Background checks should be sent to the applicable programming attorney for review. With respect to program(s) that are competition(s), family/children based and/or dating show(s) a copy should also be sent to ████████ for review.

**Collective Intelligence, Inc.**
Erika Worth, President
6715 NE 63rd Street, Suite 103-333
Vancouver, WA 98661
T: 800.436.1969
F: 800.437.8981
E: erika@cibackgrounds.com
W: http://www.cibackgrounds.com/

As of June 29, 2012                                                    CONFIDENTIAL
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killers Kids* (new episodes)
Page 26 of 27

---

**Edward Myers & Associates, Inc.**
Edward Myers
11271 Ventura Boulevard, Ste 415
Studio City, CA 91604
T: 818.895.7503
E: myers@myersassociates.net
W: http://www.myersassociates.net/

---

**T&M Protection Resources, LLC**
Global Investigations & Risk Management (FIA)
Pam Panzarino
Supervisor - Investigative Analyst
230 Park Avenue, Suite 440
New York, NY 10169
T: 212.916.8853
E: ppanzarino@tmprotection.com
W: www.tmprotection.com

---

**MILLERGROUP Investigations & Protective Services, Inc.**
Michael Miller
1112 Montana Avenue #100
Santa Monica CA 90403
T: (310) 458-6006
C: (310) 617-1007
E: mm@millergroup.tv
W: www.millergroup.tv

209964v4

As of June 29, 2012                                                          CONFIDENTIAL
**PLANÈTE BLEUE TÈLÉVISION INC.**
*Killers Kids* (new episodes)
Page 27 of 27

<u>**To Be Attached as PDFs**</u>

**SCHEDULE A – PRODUCTION DELIVERY & TECHNICAL REQUIREMENTS**

**EXHIBITS A, A-1, B-1 AND B-2 – INSURANCE REQUIREMENTS**

**ATTACHMENT 1 – LANGUAGE PERTAINING TO SEXUALLY EXPLICIT CONDUCT**

# 2012
# A+E TELEVISION
# NETWORKS, LLC.

# PRODUCTION DELIVERY
# &
# TECHNICAL REQUIREMENTS

(Ver 12.1 Rev. 6/15/2012)

NOTE:
BEFORE FINAL PAYMENT CAN BE PROCESSED, ALL DELIVERABLES MUST BE RECEIVED AND
ACCEPTED BY A+E NETWORKS

# Table of Contents

I.   HD PRODUCTION AND DELIVERY ........................................................................ 7
    1.1 Program Deliverables Timeline ...................................................................... 7
    1.2 Production and Post  Workflows ..................................................................... 7
    1.2.1: TABLE OF ACCEPTABLE DELIVERY FORMATS ................................. 7
    1.3 Programs Containing Mixed frame rate content ............................................ 8
    1.3.1: TABLE OF MIXED FRAME RATE GUIDELINES ................................... 8
    1.3.2 Programs Containing Archival/Non-Original Material ............................... 10
    1.4 Utilizing archival source material and Aspect Ratio conversion ................... 11
    1.5 1080i/50 and 1080p/25 Programs .................................................................. 11
    1.6 Acceptable HD Shooting formats ................................................................... 11
    1.7 Acceptable Primary "A" and Secondary "B" Class HD cameras specs ......... 12
    1.8 Unacceptable Cameras .................................................................................. 12
    1.9 HD Editing Codecs ....................................................................................... 12
    1.9.1 Still Photo Image Quality ........................................................................... 12
    1.9.2 Timing Out Your Program/Delivering Timing Sheets ............................... 13
    1.10 Action and Title Safety ............................................................................... 14
    1.11 Bug Clearance ............................................................................................. 14
    1.12 Rating and CC Icon Clearance .................................................................... 15
    1.13 Font Licensing & Technical Requirements ................................................. 15
    1.14 Textless Materials ....................................................................................... 15
    1.14.1 Textless Responsibility ............................................................................. 15
    1.15 Created Maps & Charts ................................................................................ 15
    1.16 Created Graphics and Text .......................................................................... 16
    1.17 Textless Questions? ..................................................................................... 16
    1.18 End Credit Production Company Cards ....................................................... 16
II. ROUGH CUTS ....................................................................................................... 16
    2.1 Rough cut Media Format ............................................................................... 16
    2.1.1: Table of rough cut file specs ...................................................................... 16
    2.2 Final Scripts .................................................................................................. 16
    2.3 Cutdown Preferences/Suggested Cuts .......................................................... 17
III. ORIGINAL MUSIC .............................................................................................. 17
    3.1 Music Basics .................................................................................................. 17
    3.2 Music Deliverables ........................................................................................ 17
    3.3 Original Music Labeling ................................................................................ 17
    3.4 Original Music File Naming ........................................................................... 18
    3.5 Music Publishing Requirements .................................................................... 18
IV. SHIPPING and DELIVERY INFORMATION ....................................................... 18
    4.1 SHIPPING ADDRESSES AND PERSONNEL .............................................. 18
    4.2 MEDIA DELIVERABLES .............................................................................. 19
    4.2.1 Alternate Delivery Permissions .................................................................. 20
    4.2.2 Tape Leader Information ............................................................................. 21
    4.3 Rights Bible Uploads ................................................................................... 21

4.4 Photo Materials Delivery ........................................................................................... 21
4.5 Public Domain Archival Footage............................................................................... 21
4.6 Upload to Debut, Scripts, Credits, Lower Thirds, Synopses ..................................... 22
V. TECHNICAL EVALUATION ......................................................................................... 22
5.1 Process ...................................................................................................................... 22
5.2 Common Reasons for Failure .................................................................................... 22
5.3 QC/Review Requirement ........................................................................................... 22
5.4 Tech Eval Failure ...................................................................................................... 22
5.5 Turn-around time for fixed materials......................................................................... 22
VI. AUDIO for TEXTED MASTERS ................................................................................... 23
6.1 Audio Allocations ...................................................................................................... 23
6.2 M&E Definition ........................................................................................................ 23
6.3 M&E Mixing Instructions .......................................................................................... 23
6.4 Dialogue and M&E .................................................................................................... 23
6.5 Revoiced Translations ............................................................................................... 24
6.6 Stems and Fades......................................................................................................... 24
VII. AUDIO for TEXTLESS MASTERS ............................................................................. 24
7.1 Audio Allocations ...................................................................................................... 24
7.2 Channel 1: Dialogue/Interviews/Story Critical ......................................................... 24
7.2.1 A+E NETWORKS Definition of "Dialogue"........................................................... 24
7.2.2 Profane Language and Bleeping/Silencing ............................................................. 25
7.3 Channel 2: Effects, NAT sound and TV/Film Clips................................................... 25
7.4 Music & Effects & Dialogue (MED) ......................................................................... 25
7.5 Mono Compatibility ................................................................................................... 25
7.6 Stereo Music Requirement......................................................................................... 25
VIII. MULTI-TRACK AUDIO FILES ON DVD ................................................................. 26
8.1 Data DVD w/ Audio Files.......................................................................................... 26
8.2 Audio stems at Full Level / Naming Convention ....................................................... 26
8.3 Audio Track Assignment Sheet (embedded) .............................................................. 26
8.4 Non-English Dialogue ............................................................................................... 26
8.5 TV & Film Clips ........................................................................................................ 27
8.6 Surround Sound Mixes ............................................................................................... 27
IX. PROMOTIONAL MATERIALS ..................................................................................... 27
9.1 Promo Reel Format .................................................................................................... 27
9.2 Promo Materials Clearance ........................................................................................ 27
9.3 Promo Audio Configuration ....................................................................................... 27
X. PHOTOGRAPHS.............................................................................................................. 28
10.1 Photo Format Specifications / Guidelines................................................................. 28
10.2 Photo quantity & Info .............................................................................................. 28
10.3 Photo Resolution ...................................................................................................... 28
10.4 Quality of Photos ..................................................................................................... 28
10.5 File Formats ............................................................................................................. 28
10.6 Photo Credits & Captions ......................................................................................... 28
10.7 Image Content .......................................................................................................... 28
10.8 Celebrity Host Photos .............................................................................................. 28
10.9 Lifestyle Programs ................................................................................................... 29

10.10 BIOGRAPHY® Series ................................................................................... 29
10.11 Unacceptable Materials ............................................................................... 29
10.12 Photo Delivery Timeline .............................................................................. 29
10.13 Upconverted Photographs: .......................................................................... 29
XI. PROGRAM VIDEO SCREEN CAPTURES ("Grabs") ................................... 29
11.1 Video Grabs Format Specifications / Guidelines ........................................... 29
11.2 Video Grabs quantity & Info ......................................................................... 29
11.3 Video Grabs Resolution ............................................................................... 29
11.4 Quality of Video Grabs ................................................................................. 29
11.5 File Formats ................................................................................................. 29
11.6 Video Grabs Captions .................................................................................. 30
11.7 Video Grabs Content .................................................................................... 30
11.8 Celebrity Host Video Grabs .......................................................................... 30
11.9 BIOGRAPHY® Series ................................................................................... 30
11.10 INTERVENTION Series .............................................................................. 30
11.11 Video Grabs Delivery Timeline .................................................................... 30
XII.   ENGINEERING SPECIFICATIONS ............................................................. 30
12.1 Program Video Levels ................................................................................... 30
12.2 Video Luminance (White) Level .................................................................... 31
12.3 Set-Up (Black) Level .................................................................................... 31
12.4 Chrominance ................................................................................................ 31
12.5 Gamut .......................................................................................................... 31
12.6 Program Audio Levels & Dialnorm ................................................................ 31
12.7 Program Audio Dynamic Range .................................................................... 32
12.8 Prominent Audio Mix .................................................................................... 32
12.9 10dB Audio Separation (Avoiding a Hot Mix) ............................................... 32
XIII. COMPUTER GRAPHICS/COMPUTER GENERATED CONTENT ............... 32
13.1 Graphics Resolution, Scanning and Field Dominance .................................. 32
13.2 Upconverted HD Graphics ............................................................................ 32
13.3 Textless Graphics ........................................................................................ 33
13.4 Graphic Elements ......................................................................................... 33
13.5 CG and/or Green screen compositions and text ........................................... 33
13.6 Text "Readability" and Font Sizes ................................................................ 33
13.7 Graphics Approval ........................................................................................ 33
XIV. CLOSED CAPTIONING .............................................................................. 33
14.1 CC Requirements ......................................................................................... 33
14.2 Non-Standard Caption Encoding Workflows ................................................. 34
14.3 Failure to Caption ........................................................................................ 34
14.4 CC Sponsorship Prohibitions ....................................................................... 34
14.5 Documentary Style Captioning ..................................................................... 34
14.6 Dramatic, Reality and Dialogue Style Captioning ......................................... 34
14.7 A+E NETWORKS Preferred CC Rates and Vendors .................................... 34
XV. RECLAMATION OF ORIGINAL FOOTAGE ................................................. 37
15.1 Mandatory Delivery of Original Footage ....................................................... 37
15.2 Hard Drive Technical Requirements ............................................................. 37
15.3 Media Requirements .................................................................................... 38

15.4 Media from Avid or Final Cut 'Projects' ................................................................ 38
XVI. CREDITS ................................................................................................................ 38
16.1 Credits ................................................................................................................... 38
16.2 Credits over Black ................................................................................................. 38
XVII. PAYMENT REMITTANCE PROCEDURES ........................................................ 39
17.1 Event Triggers ...................................................................................................... 39
17.2 Required Invoice Information ............................................................................... 39
17.3 Definition of "Final Delivery" ............................................................................. 40
XVIII. RIGHTS BIBLE REQUIREMENTS .................................................................... 40
18.2 Required Third Party Rights ................................................................................. 41
18.3 Rights Waivers ..................................................................................................... 41
18.4 Original / Composed Music .................................................................................. 41
18.5 Music Cue Sheets ................................................................................................. 41
18.6 Music Labeling ..................................................................................................... 43
18.7 SAMPLE COMPOSER AGREEMENT ............................................................... 44
18.8 A+E NETWORKS/EXTREME MUSIC BLANKET LICENSE AGREEMENT ......... 53
18.9 Example Rights Bible Affidavit ........................................................................... 56
XIX. ACCEPTABLE HD CODEC CHART ..................................................................... 57
XX. SHORT FORM PROGRAMS .................................................................................. 57
20.1 Short Form Definition .......................................................................................... 57
20.2 Short Form Deliverables ...................................................................................... 58
20.3 Multiple Short Form Pieces ................................................................................. 58
20.4 Short Form Rights Bibles ..................................................................................... 59
20.5 QuickTime Movie (.mov) DVD Format ............................................................... 59
XXI. PREVIEW CLIPS (final program samplings) ......................................................... 59
21.1 Preview Clip Definition ....................................................................................... 59
21.2 Source Materials Clearance .................................................................................. 60
21.3 Deliverables ......................................................................................................... 60
21.4 Length .................................................................................................................. 60
21.5 Preview Clip Source ............................................................................................. 60
21.6 Style ..................................................................................................................... 60
21.7 Preview Clip Versions .......................................................................................... 60
21.8 Time Code Data .................................................................................................... 61
21.9 Title Graphic ........................................................................................................ 61
21.10 Delivery Timeline ............................................................................................... 61
XXII. FILM-TO-HD TRANSFER RECOMMENDATIONS ............................................ 61
XXIII. INTERNATIONAL TIP SHEET .......................................................................... 62
XXIV. 3D TECHNICAL SPECIFICATIONS .................................................................. 67
XXV. EXCEPTIONS ...................................................................................................... 70

CONTACTS



NOTE:  Please contact the programming manager/coordinator on your program to obtain the **Programming Procedures Packet**, which gives network specific information.

As of the date hereof, A+E Networks has the following programming services (each a "Network"):  A&E Network ("A&E"), HISTORY, H2, Lifetime ("LT"), Lifetime Movie, Network ("LMN"), Lifetime Real Women ("LRW"), BIO., Crime and Investigation ("CI") Military History Channel ("MHC"),  and History en Espanol ("HCE").

# I.    HD PRODUCTION AND DELIVERY

## 1.1 Program Deliverables Timeline

A+E Networks require that all program deliverables arrive a minimum of 5 business days in advance of its premiere date.

## 1.2 Production and Post  Workflows

A+E Networks requires that all content be shot, composed, mastered and delivered in a single consistent format and frame/field rate.  Due to this requirement, you are prohibited from shooting then converting to a different frame rate within the camera.  An example of this would be an HDV camera that shoots in 23.98p but records in 1080i, thereby causing a 2:3 pulldown to be embedded within the media.

If your program and/or series will contain mixed frame rate content due to archival/non-original footage, and this prevents you from meeting the above requirement, you must receive advance approval from your Programming Executive and notify your Stamford Production Services representative prior to inception of series, season or program production.  If some, but not all episodes of a series or season, do not meet this requirement, this same advance approval and notification applies.  See 1.3.1 for additional information about working with mixed frame rate content in your program.

## 1.2.1: TABLE OF ACCEPTABLE DELIVERY FORMATS

| Video Format | Audio Format | Tape Format | Timecode |
|---|---|---|---|
| 1080/23.98PsF | Stereo or 5.1 | HDCAM or HDCAM SR (4:2:2 only)** | Non Drop-Frame |
| 1080/59.94i | Stereo or 5.1 | HDCAM or HDCAM SR (4:2:2 only)** | Drop-Frame |
| 1080/25PsF* | Stereo or 5.1 | HDCAM  or HDCAM SR (4:2:2 only)** | Non Drop-Frame |
| 1080/50i* | Stereo or 5.1 | HDCAM or HDCAM SR (4:2:2 only)** | Non Drop-Frame |

*Delivery of 25p or 50i masters as the native frame-rate, will require additional deliverables cross-converted to 1080/59.94i.
** HDCAM SR may be delivered with prior approval if 5.1 audio is being produced and delivered.

## *1.3 Programs Containing Mixed frame rate content*

If your program contains mixed frame rate material, please consult the chart below for determining the frame rate for newly shot/created material and mastering.

## *1.3.1: TABLE OF MIXED FRAME RATE GUIDELINES*

| Majority of Production footage frame rate | Non-Standard Production footage frame rates | % of Non-Standard Production footage | Editorial Timeline | Delivered Program Master | Special Instructions |
|---|---|---|---|---|---|
| 1080/23.98p | 1080/23.98p | n/a | 1080/23.98p | 1080/23.98p | |
| | 1080/59.94i, 525/59.94i* (NTSC SD) | 0-10% | 1080/23.98p | 1080/23.98p | Conversion of non-standard footage must be applied using proper frame removal and de-interlacing techniques |
| | 1080/59.94i, 525/59.94i* (NTSC SD) | More than 10% | 1080/59.94i | 1080/59.94i | Conversion of standard footage must be applied using proper telecine techniques. Repeated frames are not permitted. |
| 1080/59.94i | 1080/59.94i or 525/59.94i* | n/a | 1080/59.94i | 1080/59.94i | |
| | 1080/23.98p, 525/59.94i* (NTSC SD) | 0-10% | 1080/59.94i | 1080/59.94i | Conversion of 23.98 non-standard footage must be applied using proper telecine techniques. Repeated frames are not permitted. |
| | 1080/23.98p, 525/59.94i* (NTSC SD) | More than 10% | 1080/59.94i | 1080/59.94i | Conversion of 23.98 non-standard footage must be applied using proper telecine techniques. Repeated frames are not permitted. |

| Majority of Production footage frame rate | Non-Standard Production footage frame rates | % of Non-Standard Production footage | Editorial Timeline | Delivered Program Master | Special Instructions |
|---|---|---|---|---|---|
| 1080/25p | 1080/25p | n/a | 1080/25p | 1080/25p | |
| | 1080/23.98p, 1080/50i, 625/50i* | 0-10% | 1080/25p | 1080/25p | Conversion of non-standard footage to 25p must be applied using proper conversion techniques. Repeated frames are not permitted. |
| | 1080/23.98p, 1080/50i, 625/50i* | More than 10% | 1080/25p | 1080/25p | Conversion of non-standard footage to 25p must be applied using proper conversion techniques. Repeated frames are not permitted. |
| 1080/50i | 1080/50i | n/a | 1080/50i | 1080/50i | |
| | 1080/23.98p, 1080/25p 625/50i* | 0-10% | 1080/50i | 1080/50i | Conversion of non-standard footage to 50i must be applied using proper conversion techniques. Repeated frames are not permitted. |
| | 1080/23.98p, 1080/25p, 625/50i* | More than 10% | 1080/50i | 1080/50i | Conversion of non-standard footage to 50i must be applied using proper conversion techniques. Repeated frames are not permitted. |

| Majority of Production footage frame rate | Non-Standard Production footage frame rates | % of Non-Standard Production footage | Editorial Timeline | Delivered Program Master | Special Instructions |
|---|---|---|---|---|---|
| 1080/30p | 1080/30p | n/a | 1080/59.94i | 1080/59.94i | |
| | 1080/23.98p, 1080/59.94i, 525/59.94i* (NTSC SD) | 0-10% | 1080/59.94i | 1080/59.94i | Conversion of 23.98 non-standard footage must be applied using proper telecine techniques. Repeated frames are not permitted. |
| | 1080/23.98p, 1080/59.94i, 525/59.94i* (NTSC SD) | More than 10% | 1080/59.94i | 1080/59.94i | Conversion of 23.98 non-standard footage must be applied using proper telecine techniques. Repeated frames are not permitted. |

*Archival footage only.  Newly shot or created SD content is not permitted.

All frame rate conversions must be applied using the highest quality conversion techniques. Any conversions that compromise the quality of the source content in any way will be subject to rejection.  720p is not included on this table as it is a prohibited shooting format.  See Table 1.2.1 for the allowed shooting and delivery formats and frame rates.

If your particular scenario is not represented in the above table, please contact your Stamford Production Services representative to discuss further.

## 1.3.2 Programs Containing Archival/Non-Original Material

When working with archival/non-original content, it is critical that you obtain the content in its native frame rate.  If you are planning to use SD, archival footage or non-original footage, please consult the Table of Mixed Frame Rate Guidelines above to determine appropriate post-production frame-rate for editing and delivery.  Please make sure you contact your Programming Executive as well as your Stamford Production Services representative to discuss the percentage of non-native frame rate or non-original HD content within your program.

Please contact ███████████████████████████████ to request the A+E Networks Archive Deals and Preferred Rates packet.

## 1.4 Utilizing archival source material and Aspect Ratio conversion

If there is a need to utilize SD source material, you must upconvert to HD using the highest quality hardware or software available. The technical quality of any upconverted content may be subject to QC rejection.

If you are using archival footage or photographs that are natively 4:3, it will be necessary to consult with both Stamford Production Services and International to determine the proper methods of converting and repositioning 4:3 content to 16:9 HD and to discuss the percentage of these materials within the overall program. Please contact your Stamford Production Services and International projections representative to discuss.

Stretching the 4:3 image to fill the 16:9 frame is prohibited. Pillarboxed HD images are prohibited. It is preferred that a combination of Zoom, Pan/Tilt & Scan is employed to fill the 16:9 frame. If it is absolutely necessary to preserve the original 4:3 framing for some images, then the image may be placed within a 16:9 graphic mortise.

All SD source material must have all line 21 closed captioning data blanked. If this is not done, the data may be visible at the top of the video when your final HD show is downconverted to NTSC Letterbox

## 1.5 1080i/50 and 1080p/25 Programs

1080i/50 and 1080p/25 format materials will be accepted as described herein. If you have the written approval of the applicable A+E Networks Programming Executive to acquire or deliver at either 1080p/25 or 1080i/50 and will edit your program on either a 25p or 50i timeline, A+E Networks requires the program masters be delivered in those native formats. If so, your program must comply with EBU specifications and have a program start time of 1:00:00. If delivering in one of these formats, additional deliverables will be required. See table 4.2

## 1.6 Acceptable HD Shooting formats

Acceptable HD shoot and record formats include: 2-4k, HD-D5, HDCamSR, HDCam, DVCPro 100, AVC Intra 100, XDCam HD (35mb), XDCam EX (35mb), XDCam HD422, and DSLR by request. Please contact your Stamford Production Services Representative to submit and receive approval for DSLR usage.

## 1.7 Acceptable Primary "A" and Secondary "B" Class HD cameras specs

Please contact your Production Services Representative for the latest list of acceptable A and B class cameras. If you have a camera that is not on the list that you would like to use, contact your Production Services Representative for approval.

- An "A" class camera should be used for primary shooting
- An "A" class camera should be used for 75% or more of the shot footage included in any single episode.
- The "A" class camera is defined as having a 2/3" optical sensor or larger.
- A "B" class camera should be used for secondary shooting.
- The sum of all B camera footage should not exceed 25% of the shot footage included in any single episode.
- A "B Class" camera is defined a having a minimal 1/3" optical sensor and offer approximately ½ the resolution of the "A" camera.
- All B cameras must match the frame rate of the A camera(s).
- The acceptance of "B" class cameras will be dependent upon the resolution and the recording codec used.
- All B cameras must be approved in writing by your Programming Executive and your Production Services representative.

## 1.8 Unacceptable Cameras

**You are prohibited from using any camera to shoot in one frame rate and record in another, i.e. converting the footage to a different frame rate within your camera. An example of this would be the SONY HVR-V1U camera that shoots in 23.98p but records to tape as 1080i, thereby causing a 2:3 pulldown to be embedded within the media. If you are looking for your master to have a 'film look', you must shoot, edit and deliver in 23.98 in order to achieve this.**

## 1.9 HD Editing Codecs

As of the date hereof, acceptable HD editing codecs are: Uncompressed SMPTE 292 (HD-SDI), XDCam HD, XDCam HD422, 8 and 10 bit Avid DnX 145/220, DVCPro100 and ProRes422. All SD based codecs are unacceptable. (See chart at end of this Schedule)

## 1.9.1 Still Photo Image Quality

Photos and other still images that appear in your programs must be HD quality. Scanned images must have a minimum resolution of 700dpi @ 1920x1080. Low-resolution images, regardless of source, are not acceptable and are subject to rejection based on visual quality.

## *1.9.2 Timing Out Your Program/Delivering Timing Sheets*

All rough cuts and Broadcast Masters must be accompanied by a timing sheet outlining each segment's IN, OUT and DURATION information based on a 29.97 (a/k/a 59.94) drop frame time clock.  This is true, even if your program is being shot, edited and delivered in a different frame rate, i.e. **23.98p.**  The timing sheet must be emailed to your Production Services Representative in advance of delivery and included in the tape case of every full mix master.  No act/segment should be less than 6 minutes unless written approval is given by the A+E Networks Programming Representative.

Please note that each A+E Networks brand has different timing/formatting requirements.  Please consult with your production coordinator to get the correct format for your program.

TPT (Total Program Time) consists of the sum of ONLY the actual Program segment timings including the keyed credits over the end of the program.  Do NOT count the time/black between segments.

If your program is going to deliver short of the format length, notice must be provided to your programming contact in advance of final delivery.

Please use the following guidelines when timing out your program:

All program segments must start on a whole second.  The out-cues for all segments must be on a whole second.  You may end your segments with lingering frames, but the out-cue on your timing sheet must be rounded up to the next whole second. The timings provided in your timing-sheet, must not exceed the proscribed Total Program Time on your format.  (Each of the A+E Networks may have different length requirements). The extra frames added, by rounding up to the whole second on your timing sheet, will be included in your Total Program Time.  If the program delivers short, it must be short by increments of 5 seconds.  If you are assembling your program in any frame rate other than 59.94, you must compensate to make sure that the drop-frame (59.94) version of the program adheres to the timing rules noted above.  And, a timing sheet must be delivered for both native and 59.94 drop-frame time-code versions via e-mail prior to the delivery of the program.
**See the Sample Timing Sheet that must accompany all deliveries via e-mail prior to delivery and enclosed within the Texted Master tape cases.**

### SAMPLE TIMING SHEET

Series Title
Episode Title
Episode Number
Program ID

| DF Time-code in | DF Time-code out | Item | Length |
|---|---|---|---|
| 1:00:00 | 1:11:20 | SEGMENT 1 | 00:11:20 |
| 1:11:20 | 1:11:30 | BREAK 1 (black) | 00:00:10 |
| 1:11:30 | 1:19:04 | SEGMENT 2 | 00:07:34 |
| 1:19:04 | 1:19:14 | BREAK 2 (black) | 00:00:10 |
| 1:19:14 | 1:28:50 | SEGMENT 3 | 00:09:36 |
| 1:28:50 | 1:29:00 | BREAK 3 (black) | 00:00:10 |
| 1:29:00 | 1:36:20 | SEGMENT 4 | 00:07:20 |
| 1:36:20 | 1:36:30 | BREAK 4 (black) | 00:00:10 |
| 1:36:30 | 1:43:40 | SEGMENT 5 | 00:07:10 |
| | | TOTAL PROGRAM TIME | 00:43:00 |

## *1.10 Action and Title Safety*

A+E NETWORKS defines HD and SD *Safe Action Area* as a rectangle that is 90% of the Width and the Height of the production Aperture*.

A+E NETWORKS HD *Safe Title Area* is defined as a rectangle that is 80% of the Width and 90% (for letterbox downconverted content, center cut content must be 80%) of the Height of the production Aperture*. SD Safe Title Area is defined 80% of the Width and Height of the production Aperature*.  Text contained in all graphics must not exceed the Safe Title Area.
*720x480 in the case of 480-line formats

## *1.11 Bug Clearance*

A+E NETWORKS requires that all text and pertinent graphics remain clear of the Network specific branding space in the lower right corner of each program. Your Programming Representative will provide you with a Bug example to use as a guide during the editing process.

## 1.12 Rating and CC Icon Clearance

The upper 20% of the first :20 seconds of each program segment must be clear of all text or other elements that may interfere with the program rating and/or captioning notices. These notices are keyed in during telecast.

## 1.13 Font Licensing & Technical Requirements

The production company or program supplier is responsible for acquiring all necessary licenses for all fonts used when creating a program for A+E NETWORKS All fonts must be created within A+E NETWORKS gamut and luminance level specifications as noted in section XII. The fonts must be of sufficient size to withstand a downconvert to SD Letterboxed for viewing on a 4x3 monitor and still remain easily readable. If your font sizes are too small or are not easily readable your program may fail Technical Evaluation

## 1.14 Textless Materials

Textless materials must be COMPLETELY **free of all text,** numbers, abbreviations, units of measure, backplates and **should consist of 100% clean video**. These items can prevent or interfere with seamless, non-English international repurposing. Restricted items include, but are not limited to, Titles, Graphics, Maps, Lower 3rds, Graphic Backplates and ANY other text within your program including numbers and abbreviations.   If print materials (headlines, text) are superimposed on top of video as an additional layer, they should be removed in the textless version.

Customized Lower 3rd information, numbers, backplates and/or other elements must be provided separately at the end of the Textless masters. OR on a separate element reel or DVD created specifically for your Series or Special and labeled "PROGRAM X Element Reel", (where "Program X" is the title of your series or Program episode).

Footage of newspapers, street signs, etc., or other shots containing embedded text are, of course, exempt from this restriction.
Textless materials/masters containing text or backplate graphics will fail Technical Evaluation.

## 1.14.1 Textless Responsibility

In cases where A+E NETWORKS supplies a graphics package, program producers must proactively request a completely textless version for use in their textless masters if textless graphics have not yet been provided.  This is of particular importance in regard to the opening title sequence.   Do not assume that these will be supplied without follow-up on your part.

## 1.15 Created Maps & Charts

All created (non-archival) maps, charts, etc. must be created and provided clean of text on the textless versions of the program.

## 1.16 Created Graphics and Text

If you are creating or receiving any text, backplates or animated graphics with text, including, but not limited to, layers with text in the background, floating words, newspaper headlines, phrases, etc.; textless versions must be created and used on the textless reels to facilitate international repurposing in non English-speaking countries

## 1.17 Textless Questions?

For specific questions regarding international repurposing, please contact your Production Services Representative and ███████████████ in International ████████████████████████████████████) so proper arrangements can be made.

## 1.18 End Credit Production Company Cards

'Vanity' cards  from suppliers are not allowed unless specifically agreed upon in your written contract with A+E NETWORKS.  If a card is agreed upon, it must appear at the end of the final credit bed and within the credits text area, not full screen.

# II. ROUGH CUTS

## 2.1 Rough cut Media Format

All rough cuts must be provided to your Programming Coordinator or Executive on DVD, via FTP or through, A+E NETWORKS's virtual rough cut review tool.   Your Program Coordinator can provide FTP upload instructions.  All rough cuts should be formatted for viewing on a 4x3 monitor.  HD shows should be letterboxed at 16x9 on DVD with visible time code
All file based rough cuts must conform to the following specs:

## 2.1.1: Table of rough cut file specs

| Type | Aspect Ratio | Bitrate | Video codec | Audio codec | Video container | Frame Rate | Sample Rate |
|------|--------------|---------|-------------|-------------|-----------------|------------|-------------|
| SD | 640:480 or 320:240 pixel aspect for 4:3 | CBR or VBR: 700-1200 kbps video+audio total | h.264, main profile (level: no lower than 2, no higher than 4) | AAC | mp4 | same as source | 48 kHz 16 bit |
|  | 640:360 or 320:180 pixel aspect for 16:9 | CBR or VBR: 700-1200 kbps video+audio total | | | | | |
| HD | 1280:720 pixel aspect | CBR or VBR: 700-1500 kbps video+audio total | | | | | |

## 2.2 Final Scripts

All final scripts must be provided as a word document and consist of FULL TRANSCRIPTIONS AND ASSOCIATED TIME CODES of the final, finished program. Generic descriptions such as "SOT" or "Interview Bite" are not acceptable.  Non-verbatim scripts will be sent back to you for revision.  Closed Captioning file transcripts are not acceptable.

## 2.3 Cutdown Preferences/Suggested Cuts

At the end of your submitted script, a list of items preferred to be cut out during shortening of your program must be provided. Please note IN and OUT timecodes for-120 seconds to be cut from your ½ hour programs,180 seconds from 1 hour and 240 seconds for 2 hour programs. These cutdown notes must be provided within 4 days of 1st delivery of Broadcast Masters.

# III. ORIGINAL MUSIC

## 3.1 Music Basics

All originally composed music (and lyrics, if any) including all versions of such music, as well as any original music recorded but not used in the final program/series, must be delivered on a separate CD-ROM (data CD) or DVD-ROM and labeled "A+E NETWORKS ORIGINAL MUSIC" or as digital files saved onto an external hard drive.  A sample original music composer agreement is attached hereto.

## 3.2 Music Deliverables

Producer shall deliver or cause Composer to deliver to A+E NETWORKS all recorded versions of originally created music and lyrics created for each program, including all "demos" and/or materials created but not used in the final production ("Original Music").  Producers/Composers must submit all final audio versions of the Original Music elements on or before the delivery date of the applicable program according to the format, naming and labeling specifications below.

Audio Formats:
Two (2) copies of all Original Music should be submitted to A+E NETWORKS, at the address specified herein, on CD-ROM or DVD-ROM or on external hard drives, as 48k/16 or 24-bit stereo AIF files (preferred) or WAV files files.  MP3 files and audio CDs are not acceptable, except by special arrangement. For digital delivery of Original Music files contact .██████

██████████████████

## 3.3 Original Music Labeling

Disc Labeling (on-disc) or on hard drives:
1.  Please print: "A+E NETWORKS Original Music"
2.  Program or Series
3.  Program  Title / Episode #
4.  Composer/Affiliation
5.  Date
6.  "WIN CD-ROM" or "WIN/MAC CD-ROM", Etc.
7.  Listing of track numbers and music elements (song titles)

### 3.4 Original Music File Naming

Background Instrumental cues may be named by title or cue # and, if possible, should include a time-code reference.  Series/Theme packages shall include all of the following music versions, unless otherwise directed by Producer, or similarly by A+E NETWORKS:

Standard audio packages normally consist of the following:
1. Open –                          :15-20 seconds
2. Pre-Title Theme –        :60-2:00 minutes
3. 3-5 Bumper Packages -    :15, :10, :05, :03 seconds
4. Closing Theme -           :90 seconds
5. Sponsorship Bed –        :20 seconds

### 3.5 Music Publishing Requirements

Per your Production Agreement, and unless otherwise stated therein, A+E NETWORKS shall be the publisher of any/all original music commissioned for A+E NETWORKS programs (including, but not limited to, series), unless otherwise stated therein.  All pertinent composer and publishing information must be provided on a separate music cue sheet per the direction of A+E NETWORKS's Music Services Department.  All questions regarding music cue sheets should be directed to ███████████████████████  See Section 18 for additional information or delivery requirements.

ASCAP:          Escape The Ordinary Music
BMI:             A+E NETWORKS Music Publishing
SESAC:          HTV Music Publishing\

The following are Lifetime's music publishing entities dependent upon Composers' affiliation:
ASCAP:          Sonic Sister Music Inc.
BMI:             Her Muse Music Inc.
SESAC:          Soul Sister Music

# IV. SHIPPING and DELIVERY INFORMATION

### 4.1 SHIPPING ADDRESSES AND PERSONNEL

For all A+E Networks - The following must be delivered to ████████████████████

████████████████████████████████████████████

## 4.2 MEDIA DELIVERABLES

| QTY | Format | Audio | Video |
|---|---|---|---|
| REQUIRED HIGH DEFINITION MASTERS | | | |
| 1 | HDCam or HDCam SR* (23.98p or 59.94i) | Full Mix (section VII) | TEXTED/CC'd |
| 1 | HDCam or HDCam SR* (23.98p or 59.94i) | Split Track (section VII) | TEXTLESS |
| ADDITIONAL HD MASTERS – see asterisk notes below | | | |
| 1 | **Additional** HDCam 59.94i cross-convert if master is delivered in 23.98p** | Full Mix (section VII) | TEXTED/CC'd |
| 1 | **Additional** HDCam in Native Frame Rate for 25P or 50i Only*** | Full Mix (section VII) | Texted w/ Textless at tail |
| STANDARD DEFINITION MASTER | | | |
| 1 | Digibeta Letterboxed downconvert of HD Master | Full Mix (section VII) | TEXTED/CC'd |
| FOR MARKETING DEPT. (See Section VIII) | | | |
| 1 | HDCam labeled "For PROMO use only" (same format as master) | Split Track (section VII) | TEXTLESS |
| AUDIO | | | |
| 1 | DVD w/ Broadcast .wav files (Time Code stamped) | 24bit/48Khz/ 8-Tracks | Time-code should match videotape master. |
| 1 | Originally Commissioned A+E NETWORKS Music (Separate CD) | SEE ITEM 3.1 | CD/DVD |
| ORIGINAL GRAPHICS PACKAGE | | | |
| 1 | Data DVD of all graphic elements in original format/frame-rate | | |

The following must be delivered to ███████████████████████████████████
███████████████████████████████████████████████████████

| ORIGINAL SHOOT AND ARCHIVAL MATERIALS (to be delivered after all above masters are QC'd and approved) | | | |
|---|---|---|---|
| ALL | Original tapes or Firewire drives with original P2 or SxS card data, including any acquired public domain archival material | Original | Various |

*HDCAM SR is an approved delivery format if 5.1 audio is being produced and has been approved for delivery.
** Additional deliverable for Lifetime Network Only
*** Additional deliverable is only required if the native frame-rate of the project is 25p or 50i.

### *4.2.1 Alternate Delivery Permissions*

If you are unable to deliver any of the above in accordance with A+E Networks requirements, you must contact your Programming Executive immediately and acquire written approval for alternative delivery.

# *TAPE LABELING AND SLATE*

**Network** = network program is intended for (A&E, HISTORY, BIO, H2, CI, HCE, MHC, LT, LMN, LRW)

**Program ID** # = assigned by A+E NETWORKS (check w/ Program Coordinator or *Debut*)

**Series Title** = Series title if program is part of an episodic series (i.e. -- Dog the Bounty Hunter, Swamp People, etc.)

**Episode Title** = Title for that specific episode

**Episode #** = number of the specific episode in series

**Standard** = Lines of resolution / frame rate (1080p/23.98 or 1080i/59.94, etc.)

**Aspect Ratio** = 16:9, 4:3,

**Captioning** = yes or no

**Reel** # = if the delivery is on multiple reels each label should indicate "reel 1 of 2", "reel 2 of 2", etc.

**Supplier** = the name of the supplying production company (not the post facility or duplication/cc vendor)

**Ch 1 – 12** = audio channel allocations (i.e. – SFM, M&E, MED, DIA, FX, etc.)

**SOM =** The SOM should be first frame of program content-video and/or audio.

**EOM =** The EOM should be the last frame of all content-video and/or audio. Be sure to include Textless and/or other 'elements' placed after the program ends when calculating your EOM

Example:

A&E

Program ID # 38943

Dog The Bounty Hunter

Save the Dogs

Episode 120

1080i/59.94/Ch 1 – SFM L          Ch 2 – SFM R

Ch 3 – M&E L        Ch 4 – M&E R

Full-sreen 16:9

CC: Yes

Reel 1 of 1

Hybrid Films

SOM: 01:00:00        EOM: 01:22:00

### 4.2.2 Tape Leader Information

| TAPE LEADER REFERENCE SIGNALS | | | | |
|---|---|---|---|---|
| Video Description | Time Code IN | Time Code OUT | Duration | Audio |
| Color Bars | 0:58:40 | 0:59:40 | 0:01:00 | 1Khz Ref. Tone - All channels equal to 20dB below full scale |
| Black | 0:59:40 | 0:59:45 | 0:00:05 | None |
| Program Slate | 0:59:45 | 0:59:55 | 0:00:10 | None |
| Black | 0:59:55 | 01:00:00 | 0:00:05 | None |
| Program Start | 1:00:00 | TBD | TBD | Program Audio |
| | | | | |

### 4.3 Rights Bible Uploads

See Section XVIII for more information on Rights Bible materials.

### 4.4 Photo Materials Delivery

For All A+E Networks - The following PHOTO MATERIALS be delivered ████████

████████████████████████████████

| PHOTOS CLEARED FOR PROMO USE IN ALL MEDIA | | |
|---|---|---|
| QTY | Description | File Type |
| 10 | Photos - See Section XI for details | .JPEG / .TIF |
| 10 | Photo Credits and Brief Caption for each Photo | |

### 4.5 Public Domain Archival Footage

For All A+E Networks - The following must be delivered to ████████

████████████████████████████████

| ORIGINAL FOOTAGE AND OUTTAKES PUBLIC DOMAIN ARCHIVAL FOOTAGE | | |
|---|---|---|
| QTY | Description | File Type |
| ALL | Original Shoot tapes and digital media files Acquired public domain tapes or media files | See section XV |
| ALL | Footage Logs and tracking information | See section XV |

**Please Contact** ████████ **for a Tape Log example or for more information.**

### 4.6 Upload to Debut, Scripts, Credits, Lower Thirds, Synopses

See Section XVIII

# V. TECHNICAL EVALUATION

### 5.1 Process

Upon receipt of the requested material and final delivery of the Program Masters, all deliverables will go through a technical evaluation before formal acceptance and final payment is made. **A+E Networks reserves the right to require you to fix technical deficiencies immediately following notification. Notification in some instances may occur after A+E Networks' initial technical signoff.**

### 5.2 Common Reasons for Failure

Common program failure issues include:  High video levels, incorrect-chroma or black levels, flash frames, un-rendered or low resolution sequences, incorrect audio configurations, video pixilation, digital artifacting, video blocking, channel conditions, out of phase audio, hot audio mix (see section 12.9), incorrect LTC/VITC time code and audio sync.

### 5.3 QC/Review Requirement

In the interest of avoiding QC failures, A+E NETWORKS requires that you review your materials and/or have them QC'd prior to shipment to A+E NETWORKS.

### 5.4 Tech Eval Failure

All programs returned to A+E NETWORKS after fixes have been made must be accompanied by a 'Fix Sheet' (i.e., a written report - detailing all time codes and changes made to the program).  If captioning is affected, a new, closed captioned master will be required.  Fix Sheet forms are available from ███████████████████████████████ or ███████

### 5.5 Turn-around time for fixed materials

If your materials have been returned to you due to QC failure, the fixed materials should be returned to A+E NETWORKS within five (5) business days.  If you do not feel that you will be able to complete the fixes within this timeframe, please contact your Production Services Representative and your Programming Representative to agree upon a delivery date.

# VI. AUDIO for TEXTED MASTERS

## 6.1 Audio Allocations

All Texted Masters must have four channels of audio as follows:

Audio Channel allocations (Texted):

| HD and SD TEXTED MASTERS | | | |
|---|---|---|---|
| TEXTED MASTER AUDIO ASSIGNMENTS | | | Channel |
| Stereo Full Mix* | Stereo | Left | 1 |
| Stereo Full Mix* | Stereo | Right | 2 |
| Music & Effects** | Stereo | Left | 3 |
| Music & Effects** | Stereo | Right | 4 |

## 6.2 M&E Definition

**A+E NETWORKS defines M&E a/k/a "Music & Effects" as follows:

| MUSIC & EFFECTS TRACKS | |
|---|---|
| **Should Include:** | **Should NOT include:** |
| ALL MUSIC | NARRATION |
| ALL SFX AND NAT SOUND | ON-CAMERA INTERVIEWS (all languages) |
| OTHER ELEMENTS or FOLEY FX | OFF-CAMERA INTERVIEWS (all languages) |
| NON STORY-CRITICAL RE-ENACTMENTS | STORY CRITICAL RE-ENACTMENTS |

## 6.3 M&E Mixing Instructions

**The m&e tracks should be laid down at the same full mix levels as the US stereo full mix with one difference: they should **NEVER** dip for any narration or dialogue *(gives maximum flexibility for foreign language re-mixing Music levels should not overwhelm sound effects/SOT/archival footage, or vice versa.*

Do include sound effects, TV/Film Clips, nat sound (b-roll audio) and non-story-critical re-enactments on the m&e *(i.e.: things that will likely **not** be revoiced into other languages)*

Do **not** include: any dialogue/interview bites on the m&e

## 6.4 Dialogue and M&E

A+E NETWORKS's M&E tracks should contain ALL audio EXCEPT for Narration, Dialogue/Interview bites and story-critical re-enactment dialogue.  This includes: all sound

effects and b-roll audio/SOT/nat sound, non-story-critical re-enactment audio, archival film and television clips.

On-camera interviews, location dialogue in reality-based programming, and story-critical re-enactment dialogue should appear on the DIALOGUE track, not on the M&E tracks.

## 6.5 Revoiced Translations
*Re-voiced translations should only appear on the Full Mix tracks.

## 6.6 Stems and Fades
Where possible, all M&E tracks must have clean fades on music stems.  Hard cut stems are discouraged and must have fades where possible.

# VII. AUDIO for TEXTLESS MASTERS

## 7.1 Audio Allocations

All Textless masters must have four channels of audio as follows:
Audio channel allocations (Textless):

| HD and SD Textless Masters | | | |
|---|---|---|---|
| **TEXTLESS MASTER AUDIO ASSIGNMENTS** | | | Channel |
| Dialogue/Native Language Interviews/ Story-critical re-enactment dialogue* | Mono | | 1 |
| Effects, NAT Sound, TV/Film Clips** | Mono | | 2 |
| Music & Effects & Dialogue*** | Stereo | Left | 3 |
| Music & Effects & Dialogue*** | Stereo | Right | 4 |

## 7.2 Channel 1: Dialogue/Interviews/Story Critical
*On channel 1, there should never be any VO or Narration.  Non-Interview audio MUST NOT appear here.  Re-enactment audio critical to the story should appear here (for re-languaging purposes)

## 7.2.1 A+E NETWORKS Definition of "Dialogue"
On-camera interviews (provide undipped native language interviews without translation); location dialogue between characters in reality-based programming; any re-enactment dialogue that actively moves the story forward (ie, will need to be revoiced overseas).

Dialogue does NOT necessarily include all instances where there is spoken language; language used as texture or background in a scene rather than as a story-driver is not 'dialogue' for purposes of this Section 8.2.1.  (For example: police radio chatter; rocket launch countdowns; b-

roll of people walking and talking, etc.)  This audio is considered B-roll audio or NAT SOUND and should be included in the M&E and isolated effects tracks, not the isolated dialogue tracks.

Be careful not to overlap B-Roll audio on top of interview dialogue on the isolated dialogue track.  Overlapping audio of this nature causes complications with re-languaging

## 7.2.2 Profane Language and Bleeping/Silencing

PROFANE LANGUAGE should be provided UNBLEEPED on the DIALOGUE TRACKS of the TEXTLESS MASTERS and split-track DVD files ONLY.  All Full Mix tracks should contain bleeped or silenced profanity unless otherwise approved by your programming executive in writing. Please DO NOT include censorship bleeps as special effects on the M&E tracks; this will result in a request for you to redeliver the M&E without the bleeps.

## 7.3 Channel 2: Effects, NAT sound and TV/Film Clips

**On Channel 2, ALL Sound Effects, TV/Film Clips, Nat sound and Non Story-Critical re-enactments should be located here and should be at full level, even if they dip in volume to make way for narration and dialogue on the Full Mix tracks (Ch1&2 of the Texted Master).  No Interview audio should appear on this channel.  Archival Film and TV clips should also be provided clean on Channel 4 of the DVD.

## 7.4 Music & Effects & Dialogue (MED)

*** On channels 3 and 4:  As opposed to the TEXTED tracks 3 & 4, these TEXTLESS tracks 3 & 4 should be at Final Mix Levels, WITH dips for narration and translations and enable quick, seamless English re-voicing, requiring only the addition of a new Narration track. These tracks are Final mix minus narration, including any English translations.

## 7.5 Mono Compatibility

All stereo audio shall be fully Mono compatible.  This requires that when the left and right channels are summed to mono, there is no discernible difference in audio level, fidelity or quality of sound.  All audio must also remain in phase at all times.

## 7.6 Stereo Music Requirement

All music tracks must be in stereo.  If you are using a music track produced in mono, you must use a pseudo stereo process in order to make it stereo.

# VIII. MULTI-TRACK AUDIO FILES ON DVD

Please provide 24bit, 48khz, timecode stamped Broadcast wav files delivered on DVD:

| File # | DATA DVD WITH AUDIO SPLIT TRACK & MIX FILES | | | #of Track(s) |
|--------|------|------|------|------|
| | BROADCAST WAV FILE ASSIGNMENTS | | | |
| 1 | Music | Stereo Pair | L / R | 2 |
| 2 | Effects and B-roll Audio/Nat Sound | Stereo Pair (mono if not available in stereo) | L / R | 1 or 2 |
| 3 | TV/Film Clips* (see 9.5) | Stereo Pair (mono if not available in stereo) | L / R | 1 or 2 |
| 4 | Music, Effects & Dialogue (MED) | Stereo Pair (Full final mix minus Narration) | L / R | 2 |
| 5 | Dialogue (Native Language interviews / location and critical re-enactment dialogue) | Stereo Pair (mono if not available in stereo) | L / R | 1 or 2 |
| 6 | Narration | Stereo Pair (mono if not available in stereo) | L / R | 1 or 2 |
| 7 | Stereo Full Mix | Same as texted master track 1&2 | L / R | 2 |
| 8 | Stereo M&E | Same as texted master track 3&4 | L / R | 2 |

## 8.1 Data DVD w/ Audio Files

One DVD with a minimum of eight, 24 bit/48Khz Broadcast wav files must be provided.  All files must start at 1:00:00:00 and contain matching time code data to the program master. (44.1Khz files are not acceptable).

## 8.2 Audio stems at Full Level / Naming Convention

Please use the following naming convention for your audio .wav files:
Series_Episode #_Title_TrackDescription.wav

## 8.3 Audio Track Assignment Sheet (embedded)

Audio data DVD's MUST be accompanied by a fully notated track assignment / description sheet or label.  Audio DVD must have the same information on a .doc file along with any other applicable information.

## 8.4 Non-English Dialogue

For all non-English Dialogue, you must supply the native language, NOT the English translation.  English translations should only appear on the Stereo Full Mix and the isolated Narration tracks.  Be sure to include each interview bite in its entirety; do not cut the bites short to match the length of the English translation.

## 8.5 TV & Film Clips

* TV/Film Clips and re-enactment audio should be located here and should be at full level, even if they dip in volume on the Full Mix.

## 8.6 Surround Sound Mixes

If a 5.1 Surround mix is being created, please provide the following items:

**DVD 1:**
**5.1 SURROUND MASTER**
Discreet tracks, along with LT/RT on a separate DVD as time code stamped, 24bit/48Khz broadcast .wav files as follows:

| | |
|---|---|
| 1. Left Total | 7. Center |
| 2. Right Total | 8. Low Frequency Effects (LFE) |
| 3. M&E (Left) | 9. Left Surround (Rear) |
| 4. M&E (Right) | 10. Right Surround (Rear) |
| 5. Left Front | 11. Isolated Dialogue |
| 6. Right Front | 12. TBD (narration, SOT, effects etc) |

**DVD 2:**
**Pro-Tools Session Files:**
5.1 Printmaster
5.1 Music & Effects
5.1 Dialogue Stems (if available)

**HDCAM SR (where applicable):**
If you are delivering an HDCAM SR with 5.1 audio, your channel configuration must be the same as above.

# IX. PROMOTIONAL MATERIALS

## 9.1 Promo Reel Format

One TEXTLESS HD Master tape in the same format as your program master LABELED "FOR PROMO USE ONLY" must be provided.

## 9.2 Promo Materials Clearance

Only material which is cleared for, *at a minimum*, All Media and In-Context Promo, should be included on the Promo Reel. Any elements which are not cleared for All Media and In-Context Promo should not be included on the Promo Reel.

## 9.3 Promo Audio Configuration

This Promo reel must have the same audio configuration as the TEXTLESS Masters described above.

# X. PHOTOGRAPHS

## 10.1 Photo Format Specifications / Guidelines

All images must be cleared for promotional use IN ANY AND ALL MEDIA.

## 10.2 Photo quantity & Info

A minimum of 10 high resolution digital images are required, per episode, in a series. 20 images for a special. If a program includes CGI animation, please also include at least 5 stills per episode for series and 10 stills for a special. Color is required but black and white is acceptable for stock photography.

## 10.3 Photo Resolution

A+E NETWORKS requires files to be at 300 dpi, at least 5"x7" inches (1500x2100 pixels minimum).

## 10.4 Quality of Photos

A professional photographer is preferred; an experienced photographer is acceptable. Images should be properly lit. Not too dark, murky, or blown-out.

## 10.5 File Formats

Files should be in RAW, JPG or TIF format and burned to disc or sent via FTP. Do not email.

## 10.6 Photo Credits & Captions

Photo credits and brief captions must be provided along with each image, in a separate Word or Excel document. A caption may include any or all of the following: 1) who is in the photo (the character and the actor if possible); 2) what they are doing; 3) when it took place; and 4) the location.

## 10.7 Image Content

Images should dynamically portray the theme of the show and/or episode and should be a mixture of cropped face shots and full body images. The photos can be either posed or taken in mid-action. Actors' faces should be visible and should display & represent the production's environment or location.

## 10.8 Celebrity Host Photos

If you have a celebrity host, photo stills of the host on location should be provided and shot by a professional photographer.

If none of the above is available, stock art used in the program and cleared for publicity will be acceptable.

### 10.9 Lifestyle Programs

(determined solely by A+E NETWORKS; you are responsible for checking with your Program coordinator)
For Lifestyles shows, images need to be taken before and after repairs/changes have been made.

### 10.10 BIOGRAPHY® Series

For the BIOGRAPHY series, key celebrities may be photographed on the set of the Biography interviews.  If delivering stock photos, images must be in color and recent (whenever possible).

### 10.11 Unacceptable Materials

1.  Video grabs from the program.
2.  Shots taken from books or newspaper articles
3.  photographs of photographs
4.  Behind the scenes shots of crew, equipment, etc.

### 10.12 Photo Delivery Timeline

Promotional photography should be sent at least a month prior to program airdate.

### 10.13 Upconverted Photographs:

Photos should only be upconverted using the highest possible resolutions.

## XI. PROGRAM VIDEO SCREEN CAPTURES ("Grabs")

### 11.1 Video Grabs Format Specifications / Guidelines

All images must be cleared for promotional use IN ANY AND ALL MEDIA.

### 11.2 Video Grabs quantity & Info

A minimum of 10-12 digital images are required, per episode, in a series.

### 11.3 Video Grabs Resolution

1920x1080 pixels or higher from HD source. Images should be saved using the maximum possible resolution settings.

### 11.4 Quality of Video Grabs

Images should be clear, not fuzzy, blurry and should not have interlacing lines. They should be properly lit. Not too dark, murky, or blown-out.

### 11.5 File Formats

Files should be in JPG format and burned to disc or sent via FTP